**Martin SOSTRE, Plaintiff,**

v.

**Nelson H. OTIS, Acting Superintendent of Wallkill Correctional Facility, et al., Defendants.**

**No. 70 Civ. 1114.**

United States District Court,
S. D. New York.

July 28, 1971.

Peter L. Zimroth, Louis I. Parley, New York City, for plaintiff; Stanley A. Bass, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, New York City, for defendants; Samuel A. Hirshowitz, First Asst. Atty. Gen., Hillel Hoffman, Asst. Atty. Gen., of counsel.

MANSFIELD, Circuit Judge:*

In this action arising under the federal Civil Rights Law, 42 U.S.C. § 1983, plaintiff, Martin Sostre, seeks an order enjoining the supervisory personnel at Wallkill Correctional Facility, where Sostre is incarcerated pursuant to a 30 to 40-year sentence for a narcotics offense, from interfering with his receipt of literature which he has ordered through the mails. Sostre commenced the action in March 1970 seeking an in-

---

* Was assigned the case as a District Judge and after appointment to the Circuit Court of Appeals was designated to sit on the District Court for the purpose of completing this phase of the case.

junction and $20,000 damages, naming as defendants the former warden of Wallkill, the late Charles L. McKendrick, and the former Commissioner of Correction, Paul D. McGinnis. The defendants moved to dismiss the complaint for failure to state a claim upon which relief could be granted and for lack of subject matter jurisdiction. The motion was denied by Judge Motley on June 3, 1970, and the defendants filed an answer on July 9, 1970. On October 27, 1970, Sostre, proceeding *pro se,* moved for judgment on the pleadings. At the request of defendants we deferred decision pending the outcome of Sostre v. McGinnis, 442 F.2d 178 (Dkt. No. 35038, 2d Cir.), argued *en banc* October 21, 1970, which was decided on February 24, 1971. On March 26, 1971, counsel entered an appearance for Sostre and filed a memorandum of law in support of his motion for judgment on the pleadings. In this memorandum the damage claim was withdrawn and Acting Superintendent Otis and Commissioner Oswald were substituted as defendants, Rule 25(d) (1), F.R.Civ.P. Further delay has been due in part to submission of additional briefs and papers by the parties.

The case arises from Sostre's attempts to obtain assorted literature. In May 1968, while incarcerated at Green Haven Prison, Sostre subscribed to the following weekly and monthly publications: *Workers World, Liberator Magazine, Afro-America, Negro Digest, Criminal Law Bulletin, Muhammed Speaks,* and the *Buffalo Challenger.* He received none of these publications while at Green Haven. On August 9, 1969, one day after being transferred to Wallkill, he requested the above publications from Warden McKendrick, who allegedly re-plied that a check would be made and the property given to Sostre. On August 15, 1969, Sostre was given 12 copies of the *Liberator,* 5 copies of *Afro-America,* 52 copies of the *Buffalo Challenger,* and 11 copies of *Negro Digest.* He did not receive *Workers World, Muhammed Speaks,* or the *Criminal Law Bulletin.* A prison official informed

Sostre that these publications were being cleared and would be given to Sostre when they had been cleared.

On August 25, 1969, Sostre met with a deputy warden and requested, unsuccessfully, the three publications which he had not received. On August 26, Sostre submitted a written request for an interview with Warden McKendrick concerning these publications. At the interview, on September 2, 1969, Warden McKendrick refused to permit Sostre to receive *Workers World* on the ground that it contained material supporting a prisoners' riot in an army stockade in Vietnam and denied having seen the *Criminal Law Bulletin.* He granted Sostre the right to receive *Muhammed Speaks.* When Sostre attempted to claim his back issues of *Muhammed Speaks,* however, an assistant deputy warden told him that they had been thrown away.

On August 27, 1969, Sostre renewed his subscription to *Workers World* for another year although it had been and continued to be withheld from him by prison officials. On August 30, 1969, Sostre ordered two publications—*Listen Brother* and *Martin Sostre in Court*—from World View Publishers in New York City. These publications also were withheld.

Later Sostre made additional purchases of reading material as follows: on October 10, 1969, a 6-month subscription to *Claridad* (a Spanish-language magazine from Puerto Rico); on October 20, *Selected Writings of Mao Tse Tung* and *Quotations from Mao Tse Tung;* on November 6, a 1-year subscription to the *Black Panther Party Newspaper;* on December 18, a 1-year subscription to *Ramparts;* On December 19, a 10-week subscription to the *Guardian* and a copy of the *Handbook of Revolutionary Warfare,* by Kwame Nkrumah.

On March 24, 1971, the New York State Department of Correction adopted a new procedure, designated Adm. No. 82, for the screening of literature or-

dered by and sent to prisoners. This memorandum stated:

> "The policy of this Department is to allow free access to media in the institutional setting for either program or private individual use. The governing criteria are that this material be acceptable for legal mailing in the United States, should not be obscene and not tend to excite activities posing a threat to prison discipline."

The memorandum established a committee of review consisting of the head of the service unit, a member of the mental hygiene staff, the chaplains, the chief educational officer, and the superintendent, the latter three of whom could be represented by delegates. "Whoever brings up the subject of unacceptability" was instructed to "submit their argument" to this committee. The committee was empowered to report to the institutional head concerning the questioned literature, and that official was directed to make a preliminary decision. This decision was to remain in force while the committee's report and the decision itself were forwarded to the Commissioner of Correction, who was to make a final decision after review of the question by the Central Office.

On April 29, 1971, the March 24 directive was superseded by Administrative Bulletin No. 2. This bulletin provided specifically that "inmates shall be allowed to subscribe to or to receive from authorized correspondents a wide range of books, magazines and newspapers." Detailed guidelines stating seven factors which could lead to non-acceptability of literature were established. The institutional superintendents were directed to create review committees consisting of "the head of the service unit, a member of the Mental Hygiene staff, the chaplains, an education officer or teacher, or librarians, and a representative of the custodial service." The process of making decisions, and the procedure for review thereof, remained unchanged, but a paragraph was added imposing certain time limitations on the process to insure that a final decision would be reached within approximately two weeks.

The defendants do not deny that issues of the *Black Panther Party Newspaper* and *Workers World* are being withheld from Sostre. These issues are not returned to the publishers but are kept by prison officials as they arrive. They also admit that five books—*Listen Brother, Martin Sostre in Court, Selected Writings of Mao Tse Tung, Quotations from Chairman Mao*, and *Handbook of Revolutionary Warfare*—were returned to their publishers. According to letters from Assistant Attorney General Hoffman dated May 21, 1971, and May 28, 1971, what appear to be all the disputed issues of *Claridad* and the *Guardian* have been screened and approved by the review committee and have been given to Sostre.

In recent years the denial of due process in internal prison administration has been claimed with increased frequency, see Burns v. Swenson, 430 F.2d 771, 778–780 (8th Cir. 1970); Sostre v. Rockefeller, 312 F.Supp. 863, 871–873 (S.D.N.Y.1970), rev'd in part sub nom. Sostre v. McGinnis, 442 F.2d 178 (Dkt. No. 35038, 2d Cir. 1971) [hereinafter cited to pages in the slip opinion], but such claims have generally arisen in the context of the disciplining of inmates for violation of prison rules. Additional due process questions have been presented in connection with decisions concerning an inmate's suitability for release on parole, Menechino v. Oswald, 430 F.2d 403 (2d Cir. 1970), or revocation thereof, United States ex rel. Bey v. Connecticut State Board of Parole, 443 F.2d 1079 (2d Cir. 1971). At the same time, a number of cases have challenged, and courts have on First Amendment grounds overturned, decisions of prison officials denying specific literature to inmates, see Walker v. Blackwell, 411 F.2d 23, 28–29 (5th Cir. 1969) (*Muhammed Speaks*); Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y. 1970) (*Fortune News*); Shakur v. Commissioner of Corrections, 69 Civ. 4493

(S.D.N.Y.1969) (pretrial detainees permitted to receive *Black Panther Party Newspaper*). Cf. Sobel v. Reed, 327 F. Supp. 1294 (S.D.N.Y., 1971) (parolee has First Amendment right to address left-wing organizations).

There is little question that the procedure set forth in Administrative Bulletin No. 2, now in effect, would not satisfy the requirements of due process were it the mechanism by which censorship was imposed on literature in a free society outside prison walls. First, the procedure is completely *ex parte*: no notice need be given either to the publisher of the questioned material or to the inmate for whom it is destined. See Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). Second, it does not place on the censors the burden of showing that censored literature is not protected, and it appears to permit a final restraint without any judicial determination. These factors were held to invalidate a censorship scheme in Freedman v. Maryland, 380 U.S. 51, 58, 85 S. Ct. 734, 13 L.Ed.2d 649 (1965); cf. Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) (administrative agency seeking to censor must initiate judicial review of its decision). Third, persons affected by the censorship are not afforded an opportunity to be heard, Carroll v. President and Commissioners of Princess Anne, *supra*; cf. American and European Agencies, Inc. v. Gilliland, 101 U.S.App.D.C. 104, 247 F.2d 95, 97–98, cert. denied 355 U.S. 884, 78 S.Ct. 152, 2 L.Ed.2d 114 (1957).

 However, such *considerations* are obviously not dispositive of the validity of a censorship regulation imposed in the prison context. While it is clear that individuals incarcerated in penal institutions have not forfeited all the rights of free citizens, Brown v. Peyton, 437 F.2d 1228, 1230 (4th Cir. 1971); Fortune Society v. McGinnis, *supra*, 319 F. Supp. at 904; Carothers v. Follette, 314 F.Supp. 1014, 1023 (S.D.N.Y.1970), we are not unmindful that "[l]awful incar-

ceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). "A prisoner retains all the rights of an ordinary citizen *except* those expressly, or by necessary implication, taken from him by law," Coffin v. Reichard, 143 F. 2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945) (emphasis added).

"Accordingly, we conclude that any prison regulation or practice which restricts the right of free expression that a prisoner would have enjoyed if he had not been imprisoned must be related both reasonably, Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); cf. Labat v. McKeithen, 243 F.Supp. 662 (E.D. La.1965), aff'd, 361 F.2d 757 (5th Cir. 1966), and necessarily, Barnett v. Rodgers, 133 U.S.App.D.C. 296, 410 F.2d 995 (1969); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Coffin v. Reichard, 143 F.2d 443 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945); Cf. Shelton v. Tucker, 364 U.S. 479, 81 S. Ct. 247, 5 L.Ed.2d 231 (1960), to the advancement of some justifiable purpose of imprisonment." Carothers v. Follette, 314 F.Supp. at 1024.

We accept the premise that certain literature may pose such a clear and present danger to the security of a prison, or to the rehabilitation of prisoners, that it should be censored. To take an extreme example, if there were mailed to a prisoner a brochure demonstrating in detail how to saw prison bars with utensils used in the mess hall, or how to provoke a prison riot, it would properly be screened. A magazine detailing for incarcerated drug addicts how they might obtain an euphoric "high," comparable to that experienced from heroin, by sniffing aerosol or glue available for other purposes within the prison walls, would likewise be censorable as restrain-

ing effective rehabilitation. Furthermore, it is undoubtedly true that in the volatile atmosphere of a prison, where a large number of men, many with criminal tendencies, live in close proximity to each other, violence can be fomented by the printed word much more easily than in the outside world. Some censorship or prior restraint on inflammatory literature sent into prisons is, therefore, necessary to prevent such literature from being used to cause disruption or violence within the prison. It may well be that in some prisons where the prisoners' flash-point is low, articles regarding bombing, prison riots, or the like, which would be harmless when sold on the corner newsstand, would be too dangerous for release to the prison population. On the other hand, while prisoners are obviously not entitled to all of the rights of free citizens, we would be loath to find that an individual's right to read such literature as he chooses, provided no substantial danger of disruption is presented, is expressly or impliedly lost upon his incarceration, Coffin v. Reichard, *supra,* or that this right is any less significant than the right to be free from arbitrary, capricious, or unwarranted punishment.

The essential question before us is whether any procedural due process safeguards should be afforded as a matter of constitutional right to a prisoner as a means of protecting his exercise of the First Amendment rights to which he is entitled, as so limited by prison conditions. The problem of establishing due process procedures that will be fairly and reasonably suited to prison conditions has only recently been the subject of judicial consideration in other connections, Sostre v. McGinnis, *supra* (prison discipline); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970) (prison discipline); Menechino v. Oswald, *supra* (parole eligibility). This appears to be the first instance where the question has been presented with respect to a prisoner's right to receive and read literature.

It is urged that establishment of any such procedural safeguards is neither mandated nor necessary and that, since the day-to-day power to censor incoming literature (subject to final judicial supervision) is granted prison officials, the procedures followed do not matter: the concern of the courts should be limited to the correctness of the substantive results. This approach has been found unacceptable in the area of prison discipline, Sostre v. McGinnis, *supra,* and we likewise reject it in the equally important area of the prisoner's limited First Amendment rights. Indeed defendants here, by their recent adoption of a procedure having some aspects of due process, apparently recognize the inadequacy of the old approach, which not only has failed to protect such rights as the prisoner does have but has resulted in federal courts being swamped with *pro se* petitions seeking review, on a substantive basis of discipline arising out of exercise of First Amendment rights. See, e. g., Fortune Society v. McGinnis, *supra;* Walker v. Blackwell, *supra.* Furthermore, if adequate administrative procedural protection were afforded, federal courts might be relieved of jurisdiction, at least until administrative remedies had been exercised. See Eisen v. Eastment, 421 F.2d 560, 568–569 (2d Cir. 1969); Wright v. McMann, 387 F.2d 519, 527–528 (2d Cir. 1967).

On the opposite extreme there are those who advocate that there should be no censorship at all, or that the prisoner should have the full panoply of due process rights—i. e., written notice of the proposed censorship, a recorded hearing before a disinterested party where the inmate can cross-examine and call witnesses on his own behalf, representation by retained counsel or a counsel substitute, and a written memorandum of decision setting forth the evidence, the reasons for the decision, and the action taken. The approach was rejected by the court in Sostre v. McGinnis, *supra,* in considering disciplinary procedures. We likewise reject it. As Judge Kaufman stated in *Sostre:*

"If substantial deprivations are to be visited upon a prisoner, it is wise that

such action should at least be premised on facts rationally determined. * * * In most cases, it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him * * * and afforded a reasonable opportunity to explain his actions." Sostre v. McGinnis, 442 F. 2d at 198.

We agree, and for the reasons expressed in *Carothers* we believe that a prisoner is entitled as a matter of constitutional right to rudimentary due process under prison conditions including (1) notice; (2) some opportunity to object (either personally or in writing), and (3) a decision by a body that can be expected to act fairly. We see no necessity for detailed rules and procedures on the subject, as long as basic fairness is assured, or for advance court approval of censorship. See Eisner v. Stamford Board of Education, 440 F.2d 803 (2d Cir. 1971) (school officials need not obtain judicial sanction before censoring publications on school property). As the court stated in *Sostre, supra*:

> "[W]e do not believe that there is any need for the extraordinary procedure requiring defendants to submit rules and regulations governing the receipt, distribution, discussion and writing of political literature for the approval of the district court." (442 F.2d at p. 204.)

■ Applying these principles here, defendants appear to have met one of the requirements of due process, i. e., the establishment of a body that will act fairly in deciding censorship disputes. Their recently-adopted procedure represents a step toward eliminating the possibility of arbitrary action which is present when decisions regarding the acceptability of literature for prison inmates are made by a single official acting without the guidance of clearcut standards. The procedure seeks to involve responsible prison officials from a number of fields—including experts in mental hygiene, librarians, and chaplains —in evaluating each piece of literature that is challenged. Such evaluation is to be guided by a presumption that literature should be freely available, and a list of seven specific criteria of non-acceptability is provided. Moreover, the time limits within which decisions must be reached assure the inmate that his right to receive literature not posing a threat to prison order, discipline, and security will not be frustrated by undue administrative delays. In practice, the new procedures appear already to be having a healthy effect, for two publications which had been withheld from Sostre— *Claridad* and the *Guardian*—have now been screened and presented to him.

The foregoing procedure, as far as it goes, is to be commended. However, it does not go far enough. Lacking are the essential elements of notice to the prisoner that literature addressed to him has been censored or withheld and an opportunity to be heard. Notice to the prisoner is needed to inform him of the reason for delays in the receipt of literature, and also to inform him that he may present argument (either orally or in writing) to the committee in favor of a finding that the literature is acceptable. Although in some cases such an opportunity to be heard may have limited utility in that the inmate has no foreknowledge of the material he has ordered, in certain cases the inmate may be able to comment on the basis of knowledge of the material gained from reading it before incarceration, his familiarity with other works by the same author, or other sources such as book reviews, and his views as to the unlikelihood that the literature, however, inflammatory, will lead to disruption.

In view of our disposition of this case, it is unnecessary to hold an evidentiary hearing or to review the disputed publications. Cf. Carroll v. President and Commissioners of Princess Anne, *supra,* 393 U.S. at 185, 89 S.Ct. 347, 21 L.Ed.2d 325. We find that the present procedure for screening literature is deficient in the respects indicated and enjoin the defendants from preventing Sostre from receiving literature of any kind, except pursuant to a finding of unacceptability

resulting from a screening procedure in which the inmate concerned has notice and an opportunity to be heard.

Sostre's motion for judgment on the pleadings is treated as a motion for summary judgment, Rule 56, F.R.C.P., and is granted to the extent indicated.

We have noted the good faith manifested by the State and its counsel through the adoption of the procedure described above and the approval of much of the literature which Sostre ordered. The State's substantial interests in barring disruptive and inflammatory publications from its penal institutions must also be kept in mind. Therefore, we do not think it unreasonable to require that the publications not yet approved, as well as those previously returned to the publishers, be submitted to procedures complying with minimal due process, if such are adopted by the State. Accordingly, the effectiveness of this order is stayed 40 days from entry so as to permit modification of the recently-developed procedure (1) to require notice to the inmate involved, and (2) to give the inmate involved an opportunity to be heard.

It is so ordered.