Jaan K. LAAMAN

v.

Parker L. HANCOCK, Warden, New
Hampshire State Prison, et al.

Civ. A. No. 72–177.

United States District Court,
D. New Hampshire.

Dec. 4, 1972.

Jaan K. Laaman, pro se.

Thomas Rath, Asst. Atty. Gen., State of New Hampshire, for defendants.

## OPINION

BOWNES, District Judge.

This is a pro se prisoner's petition which I have construed as a civil rights action pursuant to 42 U.S.C. § 1983. Jurisdiction is based on 28 U.S.C. § 1343(3, 4).

Laaman specifies four separate actions by the defendants that allegedly violate his constitutional rights. First, and most serious, is the refusal by the

defendants to allow petitioner to have periodicals and books that he had ordered by private subscription. Second, the petitioner alleges that the defendants have refused to allow him to receive mail, that mail to and from his attorney has been opened and censored, and that receipt of his mail is subject to inordinate delay. Third, the petitioner contends that his removal from the general prison population and indefinite placement in semi-solitary confinement because of his refusal to work in profit-making prison shops violates his constitutional rights. Lastly, petitioner claims that he is not allowed to keep a typewriter and various other items of personal property in his cell.

A hearing on the petition was held on October 26, 1972.

## READING MATTER

At the hearing Laaman testified that he subscribed to both the *Guardian,* a weekly newspaper, and the *Strawberry Grenade,* a local Portsmouth, New Hampshire, publication, and that he did not receive some issues of the *Guardian* and that he has never received any issues of the *Strawberry Grenade.* In addition, Laaman complains that he ordered a book entitled *Guerrilla Warfare & Marxism,* edited by William J. Pomeroy, and that said book has been censored and made unavailable to him.

Warden Vitek stated that the petitioner can order books and magazines by private subscription, but that the literature that is ordered is subject to review by the prison Classification Committee. Warden Vitek further testified that if the Classification Committee determines that certain literature is objectionable, the objectionable reading matter is not made available to the inmate, but is stored in his personal locker. Associate Warden Clark, Chairman of the Classification Committee, stated that his Committee reviewed the *Guardian,* found no objections thereto, and is allowing the petitioner to receive the weekly newspaper. However, the Classification Committee felt that the *Strawberry Grenade* (especially page 4 of the green issue, and page 9 of the yellow issue) and the book *Guerrilla Warfare & Marxism* were "inciting and inflammatory" and have denied petitioner access to this literature.

It has long been established that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). However, it is equally true that inmates do not lose all their constitutional rights, and that the Due Process and Equal Protection Clauses of the Fourteenth Amendment follow them into prison and there protect them from unconstitutional action on the part of prison authorities carried out under color of state law.[1]

That the right to receive newspapers and magazines is part of the First Amendment is beyond question.[2] We deal with such a right here.

[T]he Constitution protects the right to receive information and ideas. "This freedom [of speech and press] . . . necessarily protects the right to receive . . ." [citing cases]. This right to receive information and ideas, regardless of their so-

1. Washington v. Lee, 263 F.Supp. 327, 331 (M.D.Ala.1966), aff'd. per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). See also Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam).

2. See Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y.1970); Nolan v. Fitzpatrick, 451 F.2d 545, 547 (1st Cir. 1971); Payne v. Whitmore, 325 F.Supp. 1191, 1193 (N.D.Calif.1971); Seale v. Manson, 326 F.Supp. 1375, 1382 (D.C. Conn.1971); Sobell v. Reed, 327 F.Supp. 1294, 1303 (S.D.N.Y.1971); Sostre v. Otis, 330 F.Supp. 941 (S.D.N.Y.1971); and Walker v. Blackwell, 411 F.2d 23, 28 (5th Cir. 1969).

cial worth . . . is fundamental to our free society.[3]

While First Amendment rights are "preferred" rights, nonetheless, they are not unlimited. Therefore, an inmate has the constitutional right to read what he pleases subject only to "a compelling state interest centering about prison security, or a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration." Fortune Society v. McGinnis, 319 F.Supp. 901, 904 (S.D.N.Y.1970).

■ The inmate's possession of reading materials may, of course, be preceded by a careful examination to detect contraband, and considerations of space, sanitation, and orderliness may require certain limitations which would otherwise be constitutionally offensive if an ordinary citizen were involved. The state may, for example, place reasonable restrictions on the number of publications received by each inmate in order to limit the burden of examining incoming materials. Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir. 1971). Censorship or exclusion of certain reading materials is justified upon a finding of a clear and present danger to prison morale, morality, discipline or security. Defendants may also take reasonable steps to prevent receipt of obscene materials, or substantially inflammatory reading matter which might pose an imminent threat to jail security. In these matters, the expert opinions of prison officials are entitled to great weight and respect by the courts. However, the fact that interests of these sorts frequently arise does not excuse the necessity of a showing that they exist in the particular case.

■ While not urged in this case, I believe that the establishment of certain procedural due process safeguards should be afforded as a matter of constitutional right to a prisoner as a means of protecting his exercise of the First Amendment rights to which he is entitled, as so limited by prison conditions. In this regard, the opinion of Judge Mansfield in the case of Sostre v. Otis, 330 F.Supp. 941 (S.D.N.Y.1971), is most enlightening and helpful, and I draw heavily therefrom. Following the *Sostre* case, *supra*, I believe that:

. . . a prisoner is entitled as a matter of constitutional right to rudimentary due process under prison conditions including (1) notice; (2) some opportunity to object (either personally or in writing), and (3) a decision by a body that can be expected to act fairly. At page 946.

I see no necessity for any more detailed rules and procedures on the subject. Basic fairness can be assured with these guidelines.

■ Applying these principles here, defendants have established a Classification Committee to review all reading matter ordered through the prison. This Classification Committee should be composed of and involve responsible prison officials from a number of fields —including, to the extent possible, experts in mental hygiene and psychiatry, wardens, librarians, chaplains, and, perhaps, even inmates—in evaluating each piece of literature that is challenged. This court is to be notified within twenty days of the composition of the Classification Committee.

■ Such evaluation is to be guided by a presumption that literature should be freely available, subject, of course, to "a compelling state interest centering about prison security, or a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration." Fortune Society v. McGinnis, *supra*, 319 F.Supp. at 904. Moreover, the time limits within which decisions are reached should be such as to assure the inmate that his right to receive literature not posing a threat to

3. Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969).

prison order, discipline, and security will not be frustrated by undue administrative delays. Therefore, all decisions by the Classification Committee should be made within seven days of their receipt of the literature in question. The prisoner has the right to be informed of the reason for the delay in the receipt of literature, and the right to present argument (either orally or in writing) to the Committee in favor of a finding that the literature be deemed acceptable.

 In light of the administrative procedure to be established, I find it unnecessary to review the disputed literature in this case in depth except to indicate, by way of guidelines, the general feelings of this court with regard to the reading matter in question. The paperback text edited by Pomeroy presents a collection of writings from Karl Marx to the present on armed struggles for liberation and for socialism. The writings in this book draw heavily on world history and economic theory as they relate to the socialist and revolutionary movements. This paperback does not appear to endanger prison security or prison discipline and, accordingly, should be made available to the petitioner. It is to be noted in this regard that the prison can impose some restrictions on the access of other inmates to petitioner's literature. For example, the prison might wish to forbid petitioner to use this book to proselytize. Turning now to the *Strawberry Grenade*, I find the situation somewhat different. The *Strawberry Grenade* is a periodical whose content can vary from issue to issue. Not every issue warrants judicial scrutiny to determine if there is a paramount state interest in denying access to it. Therefore, I express no view as to the *Strawberry Grenade* except to note that it is clearly not of high journalistic, literary, or educational standards. The availability of each issue of the *Strawberry Grenade* is to be determined by the Classification Committee following the procedure outlined above.

## MAIL

At the hearing Laaman testified that he no longer had any complaints relative to the alleged censorship of correspondence between himself and Miss Holt. Since petitioner is able to correspond with Miss Holt, this issue has become moot.

 Petitioner complained that letters to and from his attorney had been opened and censored. Warden Vitek testified that on one occasion a temporary replacement mailman who was unfamiliar with prison regulations had, in fact, opened mail between the petitioner and his attorney. However, Warden Vitek assured this court that prison regulations are in compliance with the case law which prohibits any censorship of correspondence between inmates and their attorneys. See Tyree v. Fitzpatrick, 445 F.2d 627 (1st Cir. 1971), and Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971). Since this was an isolated incident, no relief is warranted.

 Lastly, petitioner complains that his receipt of mail is subject to an inordinate delay. This does not appear to have been the fault of the prison authorities. I take judicial notice of the fact that mail delivery, even outside of prison, is often slower than one would expect or like it to be, and I find that this allegation has not been proven.

## WORK ASSIGNMENT

Petitioner contends that he has been placed in semi-solitary confinement in the prison annex for an indefinite duration without a disciplinary hearing and in violation of his constitutional rights under the Eighth and Fourteenth Amendments because of his refusal to work in the profit-making print shop to which he was assigned by the Classification Committee. Laaman stated that he was never informed of the nature of this job when he was first assigned to work in the print shop by the Classification

# 1270

Committee and that he cannot in good faith work in a profit-making prison industry as this would be in direct violation of his deeply-held principles and conscience. Furthermore, petitioner expressed his willingness to work in any other job capacity so long as this work did not involve a profit-making shop. Warden Vitek testified that Laaman was originally placed in the general prison population, that he was interviewed by the Classification Committee, and that he was then assigned to work in the print shop on the basis of this interview and his personal records. On June 26, 1972, one day after petitioner had been assigned to work in the print shop, Laaman sent a letter to the Deputy Warden asking for an immediate job change. Warden Vitek stated that because of petitioner's refusal to work in the print shop, disciplinary action was taken and Laaman was placed in "red tag" status in the annex where he is presently confined to his cell twenty-three and one-half hours per day. Warden Vitek further testified that petitioner has repeatedly been told exactly why this disciplinary action has been taken and that Laaman would be able to rejoin the general prison population and end his confinement as soon as he was willing to work at his assigned task and abide by all the rules and regulations of the prison.

This is clearly not the case of a prisoner being punished without knowing the reason or at the whim or caprice of a guard. Nor is this a case of a prisoner being assigned work that conflicts with religious tenets. Laaman may have deeply-held conscientious beliefs about prisoners working for profit, but it is a political and social principle that he seeks to vindicate, not a religious one. Prison routine and discipline can be modified so as not to force a prisoner to participate in a specific activity that he believes is contrary to the commands of his religion. But if work assignments were made on the basis of each prisoner's political and social beliefs, there would be a complete erosion of prison discipline and order.

▆▆▆▆ After an individual is convicted and incarcerated, he comes under the jurisdiction of prison rules, which often require him to work. The law is clear that an inmate may be punished for refusing to work. See Dabney v. Cunningham, 317 F.Supp. 57 (E.D.Va. 1970), and Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971). As Judge Kaufman in Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971), so aptly stated:

> For a federal court, however, to place a punishment beyond the power of a state to impose on an inmate is a drastic interference with the state's free political and administrative processes. It is not only that we, trained as judges, lack expertise in prison administration. Even a lifetime of study in prison administration and several advanced degrees in the field would not qualify us *as a federal court* to commend state officials to shun a policy that they have decided is suitable because to us the choice may seem unsound or *personally* repugnant. At page 191.

Since petitioner has not shown any deprivation of his constitutional rights and since petitioner can voluntarily end his confinement by returning to work at the job to which he was assigned, I will not intervene in disciplinary matters peculiarly within the discretion of state prison authorities.

## PERSONAL PROPERTY

Petitioner, a self-styled writer, claims that he is not allowed to keep a personal typewriter in his cell and that the prison typewriters are inadequate to prepare legal papers and articles for publication. Warden Vitek denied petitioner's request on the ground that two typewriters are available for prisoner use both in connection with legal work and otherwise, and that petitioner may use these

two typewriters at periods other than the two hour recreation period. Further, Warden Vitek testified that personal typewriters would be a nuisance in that they are noisy and might disturb other inmates residing in the open cell block.

■ I note that the legal papers submitted by the petitioner in this case were typed on prison typewriters and were very neat in appearance. I also recognize the potential nuisance that might be caused by noisy typewriters being operated late at night. Therefore, the relief requested by the petitioner is denied. However, prison officials are to make available to inmates as much writing paper and pencils as they request.

■ Petitioner inquires as to the whereabouts of various items of personal property that he brought with him to the prison and seeks to be allowed to keep these items in his cell. Warden Vitek stated that it is the policy of the New Hampshire State Prison not to allow any books or printed or written matter, with the exception of legal writings, to be carried by a prisoner into the prison. Such matter may only be mailed to him directly from the publisher. All personal items which a prisoner is not allowed to keep with him during his confinement are kept for him until the date of his release or, at his request, sent to his family. Warden Vitek further testified that petitioner was given all photocopies of legal decisions and all mail regarding petitioner's state and federal cases and photocopies of all legal decisions relating to prisoner's rights.

As Laaman now has photocopies of the legal decisions requested and as the other items of personal property are being kept in storage for him (see Pl.Ex. 3), I find that the allegations pertaining to theft of personal property are without merit.

So ordered.