Charles K. HOPKINS

v.

George H. COLLINS, Warden, Maryland Penitentiary, et al.

Civ. No. K–74–369.

United States District Court, D. Maryland.

Dec. 11, 1975.

Decree and Supplemental Opinion March 12, 1976.

Charles F. Morgan, Legal Aid Bureau, Inc., Baltimore, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Md., Donald R. Stutman, Asst. Atty. Gen. of Md., Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

Plaintiff, Charles K. Hopkins, presently confined in the Maryland Penitentiary, seeks summary judgment in connection with his quest for relief under 42 U.S.C. § 1983. Specifically, plaintiff contends that he has the right under the First and Fourteenth Amendments to receive and read while in confinement in that institution *The Black Panther*, a weekly newspaper published by the Black Panther Party. Plaintiff challenges the procedures and standards pursuant to which the defendants, the Warden and Assistant Wardens at the Maryland Penitentiary, determine the newspapers, publications and other literature which prisoners may not receive.

State of Maryland Division of Correction Regulation 250–1 (March 29, 1974) provides that mail addressed to prisoners may be returned to the sender if in the opinion of the institution such mail falls into one of the following categories:

(1) Inflammatory or advocates escape, violence, disorder, or assault.

(2) Directly or indirectly threatens the security, safety or order of the institution or its personnel.

(3) Contains coded or otherwise undecipherable language that prevents the adequate review of the material.

Plaintiff contends that those standards are broader than necessary to protect the legitimate interests of the State and violate his rights under the First Amendment. Originally, plaintiff sought injunctive as well as declaratory relief, but subsequently amended his complaint to ask only for the latter type of relief. But for that amendment this Court would have been required, as did the District Court in *Procunier v. Martinez,* 416 U.S. 396, 398, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), to ask that a three-judge District Court be convened pursuant to 28 U.S.C. § 2281 *et seq.* since the challenged regulation has statewide application in the institutions operated by the Maryland Division of Correction. However, since only declaratory relief is sought herein, a single District Judge has jurisdiction and the three-judge Court statute has no application. *Steffel v. Thompson,* 415 U.S. 452, 456–57, 94 S.Ct. 1209, 39 L.Ed.2d 505 n. 7 (1974).

In *Procunier v. Martinez, supra,* Mr. Justice Powell, in addressing the problem of censorship of prisoner mail and regulations of the California Department of Corrections pertaining thereto, observed (416 U.S. at 409, 94 S.Ct. at 1809) that "censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners" and involves both the prisoner and the party outside of confinement who is the sender or the proposed recipient. *See Aikens v. Lash,* 390 F.Supp. 663, 666 (N.D.Ind.1975); *Gray v. Creamer,* 376 F.Supp. 675, 677 (W.D.Pa.1974). Moreover (416 U.S. at 413–14, 94 S.Ct. [1800] at 1811–1812), Mr. Justice Powell wrote:

\* \* \* [W]e hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above. [Footnote omitted.]

Earlier in his opinion (416 U.S. at 408 n. 11, 94 S.Ct. at 1809), Mr. Justice Powell noted:

Different considerations may come into play in the case of mass mailings. No such issue is raised on these facts, and we intimate no view as to its proper resolution.

█ The issue of the receipt of publications mailed to prisoners from the outside has been, however, specifically considered by several District Courts in a post-*Procunier* setting. *Aikens v. Lash, supra; McCleary v. Kelly,* 376 F.Supp. 1186, 1192 (M.D.Pa.1974); *Gray v. Creamer, supra.*[1] Those Courts held the *Procunier* standards to be applicable. So does this Court. In spite of the Supreme

---

1. *See also The Luparar v. Stoneman,* 382 F.Supp. 495, 501 (D.Vt.1974).

Court's reservation of the issue, the guidelines set forth in *Procunier* would appear workable and operable with regard to receipt and use of outside publications.

■■■ In *Procunier*, the Supreme Court disapproved regulations which permit censorship of "inflammatory" letters, characterizing "[t]hese regulations [as] fairly invit[ing] prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship." 416 U.S. at 415, 94 S.Ct. at 1812. Accordingly, the use of the word "inflammatory" in the Maryland regulation under consideration herein is constitutionally infirm. Additionally, the second standard of the Division of Correction regulation permitting censorship of mail which "directly or indirectly threatens the security, safety or order of the institution or its personnel" is vague and provides insufficient guidance to officials, to inmates and to the latter's correspondents. As the Supreme Court has emphasized in *Procunier*, 416 U.S. at 415–16, 94 S.Ct. 1209, such regulations should be narrowly drawn, unless confinement officials can show that broad restrictions are necessary to the furtherance of a substantial governmental interest unrelated to the suppression of expression and required by "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners" (at 412, 94 S.Ct. 1209) (footnote omitted). Herein, the record fails to establish that the broad restrictions of the second standard of the state regulations are necessary or essential to further those legitimate governmental interests and that those interests could not be appropriately served by narrower and more specifically drawn regulations. On the other hand, the third standard of those regulations, and that part of the first standard thereof which prohibits direct advocacy of particular types of acts, would appear to be drawn with adequate specificity

and to provide limited censorship sufficiently supported by legitimate state interests.

In *Procunier*, the Supreme Court wrote (416 U.S. at 414, 94 S.Ct. at 1812 n. 14) that "[w]hile not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction" and referred to regulations of the Federal Bureau of Prisons which are far more specific than the regulations under attack herein. In addition, Mr. Justice Powell characterized the California regulations, which were promulgated after the District Court held the original California regulations unconstitutional and which were approved by the District Court, as "indicative of one solution to the problem" (416 U.S. at 414, 94 S.Ct. at 1813 n. 15). Another example of regulations which have passed constitutional muster in a post-*Procunier* setting are those which were approved in *McCleary v. Kelly*, 376 F.Supp. *supra* at 1190, and in *Gary v. Creamer*, 376 F.Supp. *supra* at 678. Taken together with the standards established by Mr. Justice Powell, regulations of the federal, California and Pennsylvania confinement institutions which passed constitutional muster in *Procunier* and in the cases in the Middle and Western Districts of Pennsylvania provide clear guidelines for the type of regulations which can constitutionally be adopted by the Maryland authorities. Those now in existence are constitutionally wanting to the extent explicated *supra*.

■■■ Plaintiff also challenges the *procedures* under which mail is withheld from prisoners at the Maryland Penitentiary pursuant to which "[t]he inmate shall be given written notice of mail that has been withheld * * * [and] may appeal such action by letter to the Commissioner." Defendants have informed this Court that they have agreed with plaintiff to modify their regulations to include the following:

If, after a reading by the authorized institution official, of any mail, publication, newspaper, periodical, literature or other written material of any kind, the official proposes that such material, or any portion thereof, be taken or kept from an inmate because of its contents, the inmate shall be entitled to the following procedures:

1. The inmate shall be furnished a written statement that certain named or described materials are sought to be taken or withheld from the inmate and setting forth the reason(s) for the proposed action. If the materials sought to be taken or withheld from the inmate were mailed or delivered to the inmate from a person outside the institution, any such person shall also be furnished with the written statement described above. The written statement shall be served on the inmate and any other such person no more than forty-eight (48) hours after the proposed decision to take or withhold the materials from the inmate.

2. When materials are withheld, the determination shall be made by the Warden and the Assistant Warden for Custody and Treatment or their designees.

3. The inmate will be given a reasonable time to respond to the decision to withhold the materials, in writing, to the Warden and his Committee.

4. In its review of the materials, the Warden and his Committee shall consider, and adopt where appropriate any existing alternative(s) short of taking or withholding written materials from the inmate.

5. No more than seven (7) days after the receipt at the institution of the materials under consideration, the Warden and his Committee shall make a written report of its decision, to include a summary of the evidence, the decision, the reason for the decision and the facts upon which the decision is based. The written report shall be given to the inmate and to any person outside the institution who mailed or delivered the written materials to the inmate.

6. The inmate and any such person shall be informed that if they object to the decision of the Warden and his Committee, either of them may appeal the decision to the Commissioner of Corrections, provided that such an appeal is made in writing, stating the reasons for the appeal, no more than five (5) days after service of the decision on them.

7. If the final decision of the Warden and his Committee, and the Commissioner of Corrections in cases where an appeal is taken, is that materials which have been mailed or delivered to an inmate from a person outside the institution will be withheld from the inmate such materials shall be promptly returned to the sender.

Plaintiff has stated that those provisions are acceptable to him. This Court hereby also approves the same, with the comment that it would be constitutionally permissible for defendants to provide that the time periods of 48 hours and 7 days referred to therein may each be lengthened in an emergency but only to the extent required by the emergency. The parties have informed this Court that a further amendment to the Maryland regulations so providing is acceptable to both sides.

In the light of such agreement, the only procedural challenge which plaintiff continues to mount relates to whether the inmate whose mail is withheld or censored is entitled to a hearing in connection with such withholding or censorship. In *Procunier,* 416 U.S. at 417–18, 94 S.Ct. at 1814, Mr. Justice Powell wrote:

We also agree with the District Court that the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Four-

teenth Amendment even though qualified of necessity by the circumstance of imprisonment. As such, it is protected from arbitrary governmental invasion. See *Board of Regents v. Roth,* 408 U.S. 564 (1972); *Perry v. Sindermann,* 408 U.S. 593 (1972). The District Court required that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence. These requirements do not appear to be unduly burdensome, nor do appellants so contend. Accordingly, we affirm the judgment of the District Court with respect to the Department's regulations relating to prisoner mail.

Mr. Justice Powell did not indicate in *Procunier* if or when a hearing is needed to meet constitutional due process requirements.

In *Wolff v. McDonnell,* 418 U.S. 539, 558–59, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974), Mr. Justice White wrote fully with regard to the hearing issue in that case in the context of loss of good time credits in connection with prison discipli-

nary problems in a Nebraska confinement institution.[2] Discussing the flexible requirements of due process, Mr. Justice White noted:

> We have often repeated that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S., at 895, 81 S.Ct. [1743], at 1748 "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Id.* at 895, 81 S.Ct., at 1748; *Morrissey [v. Brewer],* 408 U.S. [471], at 481, 92 S.Ct. 2593. Viewed in this light it is immediately apparent that one cannot automatically apply procedural rules designed for free citizens in an open society, or for parolees or probationers under only limited restraints, to the very different situation presented by a disciplinary proceeding in a state prison.

Addressing the question of what procedures were required to meet procedur-

---

**2.** Although in *Wolff,* Mr. Justice White was addressing the requirement of due process in the context of loss of good time credits in a Nebraska confinement situation, courts in a post-*Wolff* setting have applied *Wolff* to other prison situations, and have required that due process be afforded inmates who are transferred from one institution to another for punitive reasons. *See, e. g., Fano v. Meachum,* 520 F.2d 374, 376 n.2, 377–79 (1st Cir. 1975), *cert. granted,* 423 U.S. 1013, 96 S.Ct. 444, 46 L.Ed.2d 384 (1975); *Gomes v. Travisono,* 510 F.2d 537 (1st Cir. 1974) (interstate transfers); *Stone v. Egeler,* 506 F.2d 287, 288 (6th Cir. 1974). Because of the difficulty in distinguishing between "administrative" and "punitive" transfers and because administrative transfer may cause a "major change in institutional conditions" for an inmate, a number of courts imposed procedural due process requirements in administrative as well as punitive transfers. *See, e. g., Newkirk v. Butler,* 499 F.2d 1214, 1217–18 (2d Cir. 1974), and cases cited thereat, *vacated on ground of mootness,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975);

*Robbins v. Kleindienst,* 383 F.Supp. 239, 246–48 (D.D.C.1974), and cases cited thereat; *Clonce v. Richardson,* 379 F.Supp. 338, 349 (W.D.Mo.1974). *See also Williams v. Bounds,* Civil No. 74–2008 (4th Cir. Aug. 30, 1974) (Memorandum Decision in which Judges Butzner, Russell and Field indicated that *Wolff* may require minimum due process in nondisciplinary prison transfers).

Those cases which have applied *Wolff* in areas other than prison disciplinary proceedings lend support to this Court's holding that due process safeguards must be provided when mail is censored or withheld from inmates because those cases indicate that the due process requirements of *Wolff* are of broader application. The Supreme Court may soon further indicate the extent of *Wolff's* application this term since the Court has granted *certiorari* in two prison transfer cases. *Fano, supra; Haymes v. Montanye,* 505 F.2d 977 (2d Cir. 1974), *cert. granted,* 422 U.S. 1055, 95 S.Ct. 2676, 45 L.Ed.2d 707 (1975).

al due process standards, Mr. Justice White referred to *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and wrote (418 U.S. at 559, 94 S.Ct. at 2976):

> *Morrissey* held that due process imposed certain minimum procedural requirements which must be satisfied before parole could finally be revoked. These procedures were:
>
> > "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." 408 U.S. at 489, 92 S.Ct. at 2604.

And (418 U.S. at 560–63, 94 S.Ct. at 2977) Mr. Justice White continued:

> Revocation of parole may deprive the parolee of only conditional liberty, but it nevertheless "inflicts a 'grievous loss' on the parolee and often on others." [ * * * *Morrissey,* 408 U.S.] at 482, 92 S.Ct. at 2601. Simply put, revocation proceedings determine whether the parolee will be free or in prison, a matter of obvious great moment to him. For the prison inmate, the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored. Even if not restored, it cannot be said with certainty that the actual date of parole will be affected; and if parole occurs, the extension of the maximum term resulting from loss of good time may affect only the termination of parole, and it may not even do that. The deprivation of good time is unquestionably a matter of considerable importance. The State reserves it as a sanction for serious misconduct, and we should not unrealistically discount its significance. But it is qualitatively and quantitatively different from the revocation of parole or probation.

> In striking the balance that the Due Process Clause demands, however, we think the major consideration militating against adopting the full range of procedures suggested by *Morrissey* for alleged parole violators is the very different stake the State has in the structure and content of the prison disciplinary hearing. That the revocation of parole be justified and based on an accurate assessment of the facts is a critical matter to the State as well as the parolee; but the procedures by which it is determined whether the conditions of parole have been breached do not themselves threaten other important state interests, parole officers, the police, or witnesses—, at least no more so than in the case of the ordinary criminal trial. Prison disciplinary proceedings, on the other hand, take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so.

\* \* \* \* \* \*

In *Wolff,* Mr. Justice White concluded (418 U.S. at 564–69, 94 S.Ct. at 2979):

> \* \* \* We hold that written notice of the charges must be given to the disciplinary action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense. At least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the Adjustment Committee.

We also hold that there must be a "written statement by the factfinders as to the evidence relied on and reasons" for the disciplinary action. *Morrissey,* 408 U.S., at 489, 92 S.Ct. at 2604.

\*    \*    \*    \*    \*    \*

We are also of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. We should not be too ready to exercise oversight and put aside the judgment of prison administrators. It may be that an individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence; but here we must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases. Any less flexible rule appears untenable as a constitutional matter, at least on the record made in this case. The operation of a correctional institution is at best an extraordinarily difficult undertaking. Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments. There is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents.

Confrontation and cross-examination present greater hazards to institutional interests. If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability. These procedures are essential in criminal trials where the accused, if found guilty, may be subjected to the most serious deprivations, *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), or where a person may lose his job in society, *Greene v. McElroy,* 360 U.S. 474, 496–497, 79 S.Ct. 1400, 1413–1414, 3 L.Ed.2d 1377 (1959). But they are not rights universally applicable to all hearings. See *Arnett v. Kennedy* [416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)], *supra.* Rules of procedure may be shaped by consideration of the risks of error, *In re Winship,* 397 U.S. 358, 368, 90 S.Ct. 1068, 1074, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring); *Arnett v. Kennedy, supra,* [416 U.S. p. 171, 94 S.Ct. 1633] (White, J., concurring in part and dissenting in part), and should also be shaped by the consequences which will follow their adoption. Although some States do seem to allow cross-examination in disciplinary hearings, we are not apprised of the conditions under which the procedure may be curtailed; and it does not appear that confrontation and cross-examination are generally re-

quired in this context. We think that the Constitution should not be read to impose the procedure at the present time and that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination.

\* \* \* \* \* \*

Within the limits set forth in this opinion we are content for now to leave the continuing development of measures to review adverse actions affecting inmates to the sound discretion of corrections officials administering the scope of such inquiries.

We recognize that the problems of potential disruption may differ depending on whom the inmate proposes to cross-examine. If he proposes to examine an unknown fellow inmate, the danger may be the greatest, since the disclosure of the identity of the accuser, and the cross-examination which will follow, may pose a high risk of reprisal within the institution. Conversely, the inmate accuser, who might freely tell his story privately to prison officials, may refuse to testify or admit any knowledge of the situation in question. Although the dangers posed by cross-examination of known inmate accusers, or guards, may be less, the resentment which may persist after confrontation may still be substantial. Also, even where the accuser or adverse witness is known, the disclosure of third parties may pose a problem. There may be a class of cases where the facts are closely disputed, and the character of the parties minimizes the dangers involved. However, any constitutional rule tailored to meet these situations would undoubtedly produce great litigation and attendant costs in a much wider range of cases. Further, in the last analysis, even within the narrow range of cases where interest balancing may well dictate cross-examination, courts will be faced with the assessment of prison officials as to the dangers involved, and there would be a limited basis for upsetting such judgments. The better course at this

time, in a period where prisons practices are diverse and somewhat experimental, is to leave these matters to the sound discretion of the officials of state prisons. [Footnotes omitted.]

There was also present in *Wolff* the issue of opening and inspecting letters to prisoners from attorneys. In the course of holding (418 U.S. at 577, 94 S.Ct. at 2985) that " \* \* \* a rule whereby the inmate is present when mail from attorneys is inspected \* \* \* " is as much "and perhaps even more, than the Constitution requires", Mr. Justice White stated (at 575–76, 94 S.Ct. at 2984):

> \* \* \* While First Amendment rights of correspondents with prisoners may protect against the censoring of inmate mail, when not necessary to protect legitimate governmental interests, see *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), this Court has not yet recognized First Amendment rights of prisoners in this context .\* \* \*.

A number of district courts have considered what procedural due process must accompany mail censorship and have required that the inmate be given a reasonable opportunity to protest the decisions. See, e. g., Aikens v. Lash, 390 F.Supp., *supra* at 672; *The Lupara v. Stoneman,* 382 F.Supp. 495, 502 (D.Vt. 1974); *McCleary v. Kelly,* 376 F.Supp., *supra* at 1192; *Gray v. Creamer,* 376 F.Supp., *supra* at 678. See also Laaman v. Hancock, 351 F.Supp. 1265, 1268 (D.N. H.1972). What type of opportunity is so required has, however, not been determined by those Courts.

The parties have stipulated:

> On occasion, in addition to the ·instance in the present case, officials at the Maryland Penitentiary, acting under the regulations described \* \* \* [see pp. 832–833] *supra,* have refused to permit inmates to receive and read certain literature; for example, on December 5, 1973, James E. Stokes and Aaron Holsey were refused permission to receive an issue of *Worker's World,* and on January 16, 1974, James Bonnett and Aaron Holsey were refused

permission to receive an issue of the *Midnight Special.*

\* \* \* On about five occasions each year, officials at the Penitentiary, upon reviewing the literature or reading materials that inmates seek to receive and read, decide that the inmates may not receive and read such materials on account of their contents.

In the operation and maintenance of the Maryland Penitentiary and the Patuxent Institution, the Order in *Fitzgerald v. Boslow*[3] \* \* \* has not had any deleterious effect on the institution's ability to preserve internal order and discipline, to maintain institutional security, to provide personal safety for guards and inmates or to provide for the rehabilitation of prisoners, and has not created any administrative burden or expense.

Under the Interim Decree entered by this Court on July 27, 1972, in *Collins v. Schoonfield*,[3A] Civil No. 71–500–K, the Baltimore City Jail has the following regulation with regard to the literature inmates may possess and receive (slip opinion at 15–16):

"No publication or any portion thereof may be taken or kept from an inmate because of its contents unless, after appropriate investigation, it has been determined that such content presents a clear and present danger to the security of the jail, or has been banned from the mails by the United States Postal Service because of obscene content. If any publication or any portion thereof is taken or kept from an inmate for any reason, such inmate shall be notified thereof in writing and shall, on written request, be entitled to a hearing by a hearing officer in connection therewith."

In the operation and maintenance of the Baltimore City Jail, the implemen-

tation of the regulation, *supra,* has not had any deleterious effect on the Jail's ability to preserve internal order and discipline, to maintain institutional security, or to provide personal safety for guards and inmates, and has not created any administrative burden or expense.

Under those circumstances, the proper accommodation between "institutional needs and objectives and the provisions of the Constitution that are of general application", *Wolff v. McDonnell, supra,* 418 U.S. at 556, 94 S.Ct. 2963, and Mr. Justice White's entire approach in *Wolff,* strongly suggest that the inmates should be given the opportunity to protest the officials' decision at a hearing subject to the exercise of discretionary control by the "prison officials, on the spot" (418 U.S. at 566, 94 S.Ct. 2963).

The problems inherent in connection with prison disciplinary hearings which are focused upon in *Wolff* may be, in most instances, more severe than those which can be expected in the context of protests concerning mail censorship. Thus, perhaps, the same degree of flexible discretionary control by prison officials, opted for by the Supreme Court in the context of *Wolff,* may not be necessary with regard to mail issues. However, it would still appear highly desirable. That is particularly so if such control is coupled with the requirement, suggested in *Wolff* (at 566, 94 S.Ct. 2963), that the prison hearing official or officials state in writing the reason why the calling of a particular witness or the presentation of any evidence proferred by the inmate is proscribed in whole or in part. The lack of difficulties encountered in the implementation of the decrees in *Fitzgerald v. Boslow, supra,* and *Collins v. Schoonfield, supra,* is noted and supports the conclusion that the approach adopted by this Court herein will not prove detrimental to the administra-

---

**3.** *Fitzgerald v. Boslow* is Civil No. 19592 in this Court. It was affirmed in 492 F.2d 1240 (4th Cir. 1974), *cert. denied,* 419 U.S. 994, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974).

**3A.** The Collins v. Schoonfield Interim Decree, promulgated after the filing of this Court's opinion, 344 F.Supp. 257 (D.Md.1972) is itself unpublished. A copy of that Decree has been placed in the official court file in this case.

tion of Maryland's confinement institutions by the defendant officials.

Counsel for plaintiff is hereby required to present to this Court a proposed Declaratory Decree, on or before the 9th day of January, 1976. Defendants' views, with regard to such submission, including whether defendants agree or disagree therewith, and if defendants disagree, why they so do, shall be filed by counsel for defendants on or before the 26th day of January, 1976.

## DECREE AND SUPPLEMENTAL OPINION

This matter having come before the Court on the plaintiff's complaint for declaratory relief brought under 42 U.S.C. § 1983, the Court having considered the pleadings, stipulation and memoranda filed by the parties and the Court having filed its opinion in this matter on December 11, 1975, it is, this 12th day of March, 1976, hereby DECLARED, ORDERED, ADJUDGED AND DECREED that:

1. It is unconstitutional for the defendants to use as standards concerning the withholding of mail addressed to inmates of institutions operated by the State of Maryland Division of Correction any of the following:

   a. that which is "inflammatory";

   b. that which "directly or indirectly threatens the security, safety or order of the institution or its personnel".

2. It is unconstitutional for the defendants to restrict the reading materials which a prisoner may receive or read unless they show that any such restriction furthers a substantial governmental interest such as security, order or rehabilitation, and is no greater than is necessary or essential to the protection of that interest.

3. In its opinion, pages 834–835 the Court approved certain amendments to State of Maryland Division of Correction Regulation 250–1 (March 29, 1974) which defendants had agreed to adopt.

4. It is unconstitutional for the defendants to restrict receipt or reading of any mail, publication, newspaper, periodical, literature, or other written material of any kind unless the prisoner and the person (the "correspondent") who mailed or delivered the same to the prisoner are afforded at least the following additional elements of procedural due process:

   a. The prisoner and the correspondent shall be furnished a written statement that, if either or both so request, the person or persons so requesting are entitled to appear at a hearing before the Warden and his committee, or their designees, to contest the proposed decision.

   b. If a hearing is requested by either the prisoner or the correspondent, such a hearing shall be held with reasonable promptness.

   c. At the hearing, the prisoner if he appears thereat, and the correspondent if he appears thereat, shall have the right (1) to be informed of the facts which have been advanced in support of the proposed decision to restrict the reading materials; (2) to have a reasonable opportunity to contest or deny those facts; (3) to present any factual corrections and reasons why the reading materials should not be restricted; and (4) to call witnesses, introduce documentary evidence and confront and cross-examine adverse witnesses for the purpose of presenting relevant and material evidence unless to do so would create risk of reprisal or undermine authority or endanger the security, order, discipline or safety of the institution. If the committee decides not to permit the prisoner or the correspondent the opportunity to call a particular witness, present documentary evidence or confront and cross-examine an adverse witness, the committee must state in writing its reason for its decision. The committee may record its reason *in camera* if it specifies the reasons for so doing and makes its reasons for such restriction and for such *in camera* recording available for court review.

5. The defendants' specific action with regard to *The Black Panther*, complained of herein, was unconstitutional.