**Douglas GOMES et al., Plaintiffs, Appellees,**

v.

**Anthony P. TRAVISONO, etc., et al., Defendants, Appellants (two cases).**

United States Court of Appeals, First Circuit.

Submitted Dec. 4, 1974.

Decided Dec. 20, 1974.

Richard J. Israel, Atty. Gen., with whom W. Slater Allen, Jr., Asst. Atty. Gen., Providence, R. I., was on brief, for Anthony P. Travisono, etc., and others.

Max D. Stern, Boston, Mass., with whom Stern & Shapiro, Boston, Mass., Cary J. Coen, Providence, R. I., Jack Greenberg and Stanley A. Bass, New York City, were on brief, for Douglas Gomes, and others.

## ON RECONSIDERATION AFTER REMAND

Before COFFIN, Chief Judge, McEN-TEE and CAMPBELL, Circuit Judges.

PER CURIAM.

Pursuant to the mandate of the Supreme Court in Gomes v. Travisono, 490 F.2d 1209 (1973), vacated and remanded, 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974), we reconsider, with the assistance of memoranda from the parties our decision in *Gomes,* in light of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The issue before us is the extent of the impact of the rulings and

rationale of *Wolff,* dealing with the procedural safeguards constitutionally mandated for prison proceedings which can result in loss of credit for "good time", on our opinion in *Gomes,* which dealt with the procedural safeguards which should attend proceedings looking to the transfer of a prisoner to a prison in another state. Two preliminary propositions appear clear without extended analysis. The first is our recognition in *Gomes,* strengthened if anything by the thrust of *Wolff* in stressing consideration of the pressures on prison authorities, that emergency situations may require postponement of whatever procedures are prescribed. The second is the principle, reaffirmed in *Wolff,* that prisoners suffering the prospect of serious deprivations are entitled to some process. Since the calculus of disadvantage to the prisoner, relevant to identifying the process which may be "due", is not necessarily the same in a case involving loss of good time as that in an interstate transfer case, we proceed to look at the impact of such a transfer.

 There were specific findings made by the district court as to the treatment of the transferees seeking relief in this case. The court found that the transferred inmates were segregated in the receiving prisons for two to six weeks, were placed in work assignments inconsistent with their prior experience, were precluded from rehabilitative and educational programs, saw few of their friends and family, and none of them saw their attorneys. Finally, the court found that parole opportunities were affected. 490 F.2d at 1213. We concluded that, beyond these specific findings, transfer inherently involves discontinuity of program, difficulty of communication, administrative isolation pending integration into the new prison community, and the possibility of a "troublemaker" sta-

tus which might occasion an unfavorable parole decision. It suffices here to say that the presence of privations which are either identical to or comparable to punishments meted out for disciplinary infractions calls for some due process safeguards in interstate transfer cases. *See Wolff, supra,* 418 U.S. at 571, 94 S.Ct. at 2982 n. 19.

In our prior opinion, we answered the question of how much process is due for transfers acknowledged to be for disciplinary purposes by noting that in Rhode Island a working system of rules governing disciplinary hearings within a prison had been devised under a consent decree issued in Morris v. Travisono, 310 F.Supp. 857, 871–874 (D.R.I.1970), and adopted as law by the state. *Gomes, supra,* 490 F.2d at 1215. We thought it would be "anomalous, indeed, 'both from a due process and an equal protection point of view, if the prison authorities could accomplish by transfer a procedure-free punishment which they could not accomplish within their own walls.'" *Id.*[1]

 We now are confident in saying that the deprivations inherent in an interstate transfer of a prisoner are sufficient to trigger the minimal due process safeguards identified in *Wolff:* written notice of charges, opportunity to prepare a defense, hearing, and a written statement of the evidence relied on and reasons for the decision. In disciplinary transfer cases, because the premise of finding an infraction and the consequence of such a finding cannot be distinguished from the penalty and findings in *Wolff,* the additional *Wolff* procedural rights to present witnesses and documentary evidence (subject to the judgment of administrators), and to receive some inmate or staff assistance (if the inmate is illiterate or the case complex) must be

---

1. In distinguishing between punishment imposed within a prison and punishment by transfer, we do not imply that the latter is somehow improper. As the Second Circuit has noted in Haymes v. Montanye, 505 F.2d 977, No. 74–1208 (1974), "The American Correctional Association has recognized that '[i]n any penal system embracing several institutions, transfer from one to another is often an effective disciplinary procedure as well as an administrative necessity.' American Correctional Ass'n, Manual of Correctional Standards 416 (1972)."

provided. Our only remaining question is whether any requirements of the *Morris* rules, not identified in *Wolff,* should apply to interstate transfers which are alleged to be (or to have been) punitive in nature.[2]

■ The *Morris* rules deal with five facets of procedural due process: charge, investigation, hearing, review, and record. The section devoted to the charge, IA, deals with the method for reporting the violation and for dealing with the inmate pending hearing. These are matters of administrative convenience, giving various options to the prison authorities. Section II provides for investigation of the charge, internal reporting within the prison's chain of command, and specifies the means of giving the inmate written notice of the charge. While *Wolff* does not require investigation, the necessity for some evidence anticipates a need to gather it, or at least for ascertaining a source of evidence. The means is again a matter of administrative orderliness and convenience. Section III establishes hearing procedures. Beyond mechanisms for the composition of the hearing board (IIIA and B), the rule provides in C that (1) the charge be read and explained; (2) the inmate admit or deny the charge; (3) the board may interrogate the inmate and others as necessary;[3] (4) if the inmate thinks the charge against him is untrue, he may present information available to him and others. Up to this point the rules do not exceed the minimum requirements of *Wolff.* Subsection 5 does go beyond *Wolff* in that any inmate who so requests may have the assistance of a classification counselor. After decision is reached, rule 7 requires oral notice of the decision's rationale and consequences. It is now clear that written notice is required under *Wolff.*

Section IV provides for review by the warden who can approve the board's decision, order further proceedings, or reduce the punishment. Aside from recording the result in the inmate's record, the remainder of the rules indicates only that any decision arrived at must be based on substantial evidence "manifested in the record of the disciplinary proceeding". But, as defined, this does not pose a substantial burden on the board, requiring only that "if any of the facts establishing a Board determination are derived from an unidentified informant: (1) the record must contain some underlying factual information from which the Board can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement in language that is factual rather than conclusionary and must establish by its specifity that the informant spoke with personal knowledge of the matters contained in such statement." This provision establishes that the board has the discretion approved in *Wolff* to foreclose the availability of witnesses and of cross-examination. And by requiring that a decision be based on the evidence before it, the rules are aimed at preventing arbitrary determinations, which is the major thrust of *Wolff,* which commands "a written statement by the factfinders as to the evidence relied on and reasons" for the disciplinary action. If the written statement is intended to withstand scrutiny and guard against misunderstanding, it cannot indicate reliance on speculation or on facts not in the record.

Our analysis, then, comes to this: most of the *Morris* requirements are either matters of administrative convenience or necessity in meeting the requirements of *Wolff.* Only in two respects do the rules demand more than *Wolff* did. *Wolff* does not require a review of board deci-

---

**2.** Rule III C7 of the *Morris* rules, discussed *infra,* provides for only oral notice of the decision, rationale, and consequences. *Wolff's* requirement of a written summary of findings and rationale naturally works an amendment to these rules.

**3.** Rules III C2 and 3 must be read in the light of our opinion on reconsideration of Palmigiano v. Baxter, 510 F.2d 534, issued this date, requiring the prison authorities to permit the inmate the option of silence.

sions or the provision of counsel substitute whenever a prisoner requests it. In assessing whether these two provisions should be applicable to punitive interstate transfers, we note the repeated advice in *Wolff* to leave the "continuing development" of procedural devices to the sound discretion of prison officials. (418 U.S. 539, 94 S.Ct. 2963.) In Rhode Island that initial discretion has been exercised in acquiescing in and adopting the *Morris* rules for prison disciplinary hearings. That having been done, it is hard to conceive of a basis in administrative convenience for exempting decisions to transfer a prisoner to another state from the warden's review. Indeed, such an action would seem to limit his freedom in an area of decision where it is important that he retain some discretion.

As to the right to inmate or staff assistance on request, rather than only where the inmate is illiterate or the case complex, the authorities have again made a decision covering all disciplinary hearings. It is highly unlikely that a prisoner who alleges that his pending transfer has been engineered for punitive purposes would not present a sufficiently complex case so that inmate or staff assistance would be mandated under *Wolff*. Even if it might not be required, wise administrative practice would suggest it in marginal cases, if not in all cases simply to establish a clearcut administrative routine.

[7] Rather than leave a small class of allegedly or concededly punishment cases involving interstate transfers in an uncertain void as to the right to the warden's review and the right to inmate or staff assistance, Rhode Island authorities may well wish to extend these rights to all proceedings involving a disciplinary objective. However, contrary to our prior holding, and despite Haymes v. Montanye, 505 F.2d 977, No. 74–1208 (2d Cir. 1974), which in part relied on it, we cannot quite say that the Constitution requires that these aspects of the *Morris* rules be automatically applied to punitive transfers.[4]

As for transfers proposed for other than punitive purposes—e. g., "security", the best interests of others, the safety or rehabilitation of the inmate himself, the needs or shortcomings of the institution, 490 F.2d at 1214—we indicated in our prior opinion that somewhat fewer procedural safeguards would be sufficient. We now read *Wolff* as determining what procedures are due by evaluating the substantiality of the loss to the inmate and balancing that loss against the burden procedures would put on prison administrators, not by focusing on the purpose or motive of the action proposed. Since the disadvantages to the inmate flowing from an interstate transfer are substantial, whether it be characterized as punitive, administrative, or rehabilitative, the same safeguards should be available in all such cases. Naturally the type of evidence will differ. Data as to overcrowding, for example, normally will be sufficient to justify a transfer planned to alleviate congestion. And there will be many transfers proposed and implemented where objective conditions and administrative good faith leave little room for question. For this reason it should be feasible to devise convenient means for an inmate to waive his right to a hearing.

Finally, in *Gomes* we dealt with several other issues. Our order of remand to the district court left to it the fashioning of an impartial tribunal. *Wolff's* approval of the Nebraska Prison Adjustment Committee indicates that the Rhode Island Disciplinary Board passes constitutional muster. Our endorsement of the district court's requirement that reasons for transfer be noted on papers forwarded with the inmate as well as those kept in Rhode Island is

4. While one member of the panel is of the opinion that, the prison authorities having exercised their administrative judgment to provide warden review and inmate or staff assistance for in-prison punishment proceedings, no rational basis remains for denying these protections to cases where transfer is resorted to for disciplinary purposes, the majority adheres to the position taken in the text.

consistent with the rationale supporting *Wolff's* requirement of a written statement of fact findings, noted above. Our agreement with the district court that a periodic review of the status of transferred inmates is required would seem to us to involve no conflict with *Wolff.*

Our holding in Gomes is affirmed as modified. The case is remanded for further proceedings consistent with the views expressed herein.