**Robert DAIGLE et al., Plaintiffs,**

v.

**Frank A. HALL, Commissioner of Correction for the Commonwealth of Massachusetts, et al., Defendants.**

**Civ. A. No. 74-4783-S.**

United States District Court,
D. Massachusetts.

Jan. 7, 1975.

Richard E. Shapiro, Timothy J. Wilton, Prisoner's Rights Project, Boston, Mass., for plaintiffs.

Michael C. Donahue, William T. Harrod III, Asst. Attys. Gen., Robert H. Quinn, Atty. Gen., Boston, Mass., for defendants.

## REVISED OPINION AND ORDER

SKINNER, District Judge.

The Opinion and Order of December 20, 1974 is hereby withdrawn and vacated on the basis of the rehearing hereinafter mentioned in the following is substituted therefor.

The plaintiffs are three·inmates of Massachusetts Correctional Institution, Walpole, the maximum security state prison operated by the Massachusetts Department of Correction. They allege that they have been confined in the Departmental Segregation Unit (DSU) in Cell Block 10 without the due process required by the Fourteenth Amendment to the Constitution of the United States.

The matter has been presented on affidavits of the plaintiffs, of members of the Prisoners Rights Project, and of the defendants, together with copies of notices given to the plaintiffs of hearings, departmental minutes of hearings, and various intradepartmental orders and memoranda. There does not appear to be any material issue of fact.

## FINDINGS OF FACT

### 1. ROBERT DAIGLE

Robert Daigle was placed in segregation in the prison infirmary on January 14, 1974, allegedly as a result of having held a guard hostage on that day. On January 25, the Departmental Classification Committee (the Committee) * met

---

* This Committee is sometimes referred to· in the exhibits as the Departmental Classification Board, but this appears to be the same body, and for simplicity's sake will be referred to as "the Committee" in this Opinion.

to consider Daigle's classification status. Daigle was not given any prior notice of this meeting, but was permitted to be present. The alleged incident with the guard was not discussed, nor was any evidence heard. The subject of the discussion was the possibility of transferring Daigle to Bridgewater. He was placed in Cell Block 10, however, on the grounds that (a) he was not psychotic and (b) that he was a threat to the safety of others. It was reported that he had a history of epilepsy.

No reclassification hearing was held within the 90 days required by Departmental Order 4450.1, Section 4.3. A reclassification hearing was held on May 22 at which Daigle was represented. The Committee determined that the hearing on January 25 was inadequate and ordered a new hearing.

On July 2, 1974, Daigle received written notice of a hearing to be held on July 9. The notice was substantially in the form hereinafter described. The Committee did not hear any evidence with respect to Daigle's initial transfer to Cell Block 10. The focus of attention was on an incident occurring on June 11, 1974, in which Daigle had seriously injured two correctional officers, and had subsequently been found unconscious in his room. He had been taken to Beth Israel Hospital, where his condition had been diagnosed as psychomotor temporal lobe epilepsy.

The Committee made a recommendation to Commissioner Hall on September 19, in which they described the medical report and then recommended his retention in Cell Block 10. The recommendation included the following comment:

"Reviewing Mr. Daigle's behavior pattern during this incarceration was a difficult task. The three negative highlights of this period could not be adequately discussed because they are all pending action in the judicial system. These include an alleged hostage incident at Norfolk in 1973; alleged hostage incident at Walpole in January, 1974; and an alleged assault of two corrections officials in June, 1974."

These "highlights" were not established by any evidentiary hearing, nor were they discussed at the meeting of July 9, except that the prison medical officer expressed an opinion that the June 1974 assault was the result of an epileptic seizure.

It was the opinion of the medical officer, expressed in a report to the Commissioner dated July 12, 1974, that Daigle's epilepsy could be suitably controlled by medication and that continued detention in Cell Block 10 would not serve any purpose and would be detrimental.

On October 3, the Commissioner approved the retention of Daigle in Cell Block 10 with the following comment:

"Unfortunately, until the medical and psychiatric evaluations are complete, we don't seem to have an alternative placement other than Block 10 at MCI Walpole."

Daigle's detention in the DSU in Cell Block 10 has not been reviewed since that time. Between the middle of September and the first of November, however, the three plaintiffs conducted a hunger strike which resulted in their hospitalization.

### 2. ARTHUR MORROW

Plaintiff Morrow was placed in segregation on October 24, 1973, after he was accused of being drunk. He was first placed in Cell Block 9 and later that night moved to Cell Block 10. Morrow did not receive any notice regarding his placement in Cell Block 10 until February 15, 1974, when he received a letter cancelling a hearing schedule for that day. On February 25, 1974, plaintiff received a notice, substantially in the form hereinafter described, of a hearing before the Committee on March 1, 1974. At this hearing no evidence was introduced other than Morrow's disciplinary record. For the first time since he was confined in Cell Block 10 on October 24, 1973, Morrow was officially informed that the decision to place him in Cell

Block 10 was related to a stabbing incident which had occurred in his cell block. On March 6, 1974, plaintiff Morrow received a copy of the recommendations of the Board which, *inter alia*, included continued retention in Cell Block 10 for various personality, psychological and medical tests.

On May 10, 1974, plaintiff Morrow received a notice of another hearing to be held on May 15, 1974. Morrow was present at this meeting, without counsel, but no evidence was presented concerning his alleged offense. Plaintiff later received a memorandum which recommended that he be placed in DSU. This recommendation was not based on conduct or acts but was predicated on "Mr. Morrow's progress, and the opportunities for the individualized attention and treatment Mr. Morrow warrants." On May 30, 1974, Mr. Morrow received notice that Commissioner Hall concurred in the recommendation of the Board.

On August 29, 1974, plaintiff received a similar notice from defendant Solomon that a hearing would be held on September 4, 1974. The hearing solely concerned Mr. Morrow's progress in DSU and did not focus on any specific acts or conduct. The hearing was terminated and continued to September 11, 1974, at which time the stabbing incident and various disciplinary reports were discussed.

Morrow had the opportunity to explain these incidents, but no evidence concerning the charges was presented. Discussion of the stabbing incident was conducted over the protest of Morrow's counsel. Morrow has remained in DSU status since that date, but has never been informed of the recommendation of the Board from the September 4 and 11 hearings, the statement of reasons for his continued retention in DSU or of the final decision of the Commissioner.

On October 1, 1974, defendant Solomon, in a letter to defendant Hall, explicitly relied on a letter from Mr. H. Workman, a social worker, as presenting "the best rationale why continued retention for both [Morrow and Sousa] in segregation . . . is appropriate." Mr. Workman was not present at either the September 4 or the September 11 meeting. So much of his letter as relates to Morrow reads as follows:

"Since he was last reviewed by the D. C.C. he has received three disciplinary reports for threatening officers on 7–11–1974, for disobeying an order of the Superintendent, Order 4310.1 Sec. S.18B, on 8–6–1974, and for Assault on a Correction Officer on 8–4–1974. He was pleased to be found Not Guilty on the 8–6–1974 incident.

"His behavior is such that he should be continued in D.S.U. status for another 90 day period.

"On the positive side, he recently requested counseling from Mr. William Clark, Staff Psychologist, and should be encouraged to pursue this. Also, he continues his strong interest in education. Mr. Frank Weaver, Head of the MCI–Walpole school staff, has indicated that he will try to develop an educational program for him beginning in early October."

## 3. GERALD SOUSA

Plaintiff Sousa was placed in segregation on October 24, 1973, after he was accused of being involved in the stabbing of another inmate. The factual circumstances of his case as to notice and hearing are substantially the same as those of plaintiff Morrow up to the hearing of March 1, 1974. At the hearing on March 1, Sousa was presented with the option of either choosing DSU with an education program and a ninety-day review, or of facing an indefinite stay in DSU. At this hearing no evidence was introduced. On March 6, Sousa received a letter from defendant Hall concurring in the recommendation of the Committee that he be placed in DSU status.

The basis of this recommendation was as follows:

"Inmate is a character disorder of long standing [sic]. He denied his guilt in the offense for which he is

committed to a life sentence, and has been described as very bitter. While imprisoned he has sought to lead other inmates in rebellion against authority and has also acted out on his own in a violent and provocative manner, even to inflicting severe injury on Officers and possibly even to the relatively recent vicious murder by stabbing of an inmate. His associates have always been of an undesirable nature. It appears that, when he is in population, he presents a threat to the safety of both other inmates and officers and potentially to the institution, and that this threat should be minimized by housing him in a Segregated status."

On June 5, 1974, another hearing was conducted and on June 11, 1974, Sousa was informed that he was to remain confined in DSU.

The Committee's recommendation of June 11, however, reported that Sousa was "progressing well," that he should be eligible for "Educational Release" to a University of Massachusetts program, and that if his progress continued he could be considered for transfer to M.C. I., Norfolk, in the fall. On August 29, 1974, plaintiff Sousa received a notice of a hearing scheduled for September 4, 1974. After a brief discussion of plaintiff's programs the hearing was continued to September 11, 1974, at which time the stabbing incident and plaintiff's recent disciplinary record were briefly mentioned. Sousa has remained in DSU status since that date, but has never been informed of the recommendations of the Board from the September 4 and September 11 hearing, of the statement of reasons in support of his continued retention in DSU or of the final decision of defendant Hall.

In early October, counsel for the plaintiffs were provided with recommendations of several members of the Committee regarding Mr. Sousa. Among these recommendations was that of Mr. Workman, who did not attend either the September 4 or September 11 hearing. On October 1, 1974, defendant Solomon,

in a letter to defendant Hall, explicitly relied on Mr. Workman's letter as presenting "the best rationale why continued retention for both [Morrow and Sousa] in segregation . . . is appropriate."

Mr. Workman's report is attached to this Opinion as Appendix A.

## 4. NOTICE OF HEARINGS

With respect to hearings held by the Committee on February 25, 1974 and thereafter, each plaintiff received a standard notice substantially in the following form:

"On the above date a Department Classification Hearing will be conducted to review your current status and make recommendations to the Commissioner of Correction.

"The Department Classification Board was established by the Commissioner to hear cases where transfers to or from the Departmental Segregation Unit at MCI, Walpole may be recommended.

"In the event you deem it necessary you may consult with a representative prior to the scheduled hearing."

Section 6.4(a) of Department Order 4400.1, which governs notice of classification hearings provides that such notice "shall contain a description of the board and its powers, the procedures to be followed at the meeting, the reason for the meeting, and a listing of the time and place for the meeting."

## 5. DEPRIVATIONS ATTENDANT UPON DETENTION IN THE D.S.U.

Since they have been in Cell Block 10, the plaintiffs,

(a) may be released from their cells only with the approval of the officer in charge, whereas they were formerly able to move freely through the institution,

(b) must eat in their cells, whereas they formerly could eat with other inmates at the dining halls,

(c) may not visit in other cells, whereas they formerly were per-

mitted to mingle and converse privately with other inmates,

(d) when making requests must yell loudly enough for everyone in their corridor to hear in order to attract the attention of a guard, whereas they formerly could make requests to the guards privately,

(e) have been frequently denied medical assistance even after repeated requests, whereas they formerly had easy access to medical assistance,

(f) are theoretically permitted one hour of exercise per day, but in fact have been denied exercise for several weeks at a time, whereas they formerly were permitted to exercise freely both indoors and outdoors,

(g) may bathe at most twice a week, whereas they formerly could shower every day,

(h) are restricted to three one-hour visiting periods per week, and have frequently been denied visits altogether, whereas they formerly were permitted to have frequent visits for several hours at a time, both in the visiting room and on the lawn. Visitors and DSU inmates are separated by a screen and are not permitted to touch each other at any time.

In addition, plaintiff Daigle has not been permitted to attend regular Mass with the inmate population, but has been visited by the Catholic Chaplain.

## 6. PENDING CRIMINAL ACTIONS

Plaintiff Daigle has been indicted for two instances of holding guards as hostage, the most recent of which precipitated his transfer to Cell Block 10. The indictments have not yet been assigned a trial date. The alleged stabbing of an inmate has been investigated by the District Attorney of Norfolk County, but no indictment has been returned against either Sousa or Morrow, and it is not likely that any indictment will be returned.

## RULINGS OF LAW

### A. DUE PROCESS

■ The minimum requirements of due process in prison disciplinary hearings which can result in serious deprivation of privileges have been established by Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 706 (No. 73–679, 1974). The courts do not have general supervision over prisons and are limited to insuring compliance with fundamental constitutional guarantees. In terms of this court's mandate, the minimum is also the maximum. Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L. Ed.2d 224 (1974). The various decisions in this Circuit must therefore be re-read in light of *Wolff*.

In *Wolff*, the challenged proceeding was clearly identified as disciplinary and resulted in the loss of time previously credited against the term of incarceration for good behavior. The proceedings in this case were denominated classification hearings, and many of the reports and recommendations introduced into evidence were cast in terms of the treatment and rehabilitation of the plaintiffs. Paragraph 3.2 of Department Order 4450.1, upon which the defendants for some reason appear to rely, speaks in similar terms, though so vaguely as to be of no practical use. It is necessary to look behind labels to the operative effect of the proceedings. It would appear from the exhibits that "positive" euphemisms are endemic in the Department of Corrections. See, Packer, The Limits Of The Criminal Sanction, Stanford University Press (1968), p. 33.

The first task, therefore, is to identify the characteristics of a disciplinary proceeding, as opposed to "classification," "treatment," and "security."

The defendants say that "the classification board's determination that an inmate should be confined in departmental segregation unit is not more constitutionally significant than a board's determination that an inmate should be sent

from M.C.I., Norfolk to M.C.I., Walpole." (Defendants' Memorandum, p. 21). They are probably right, and if the purpose in each case is the enforcement of discipline, the same due process requirements apply in each case. In Gomes v. Travisono, 490 F.2d 1209 (1st Cir. 1973), vacated and remanded, 418 U.S. 909, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974), it was held that due process requirements in the precautionary transfer of a Rhode Island prisoner to an out-of-state institution would not be the same as those required of a disciplinary procedure. The characteristics of the two institutions were not described or taken into account. M.C.I., Norfolk and M.C.I., Walpole, however, have been deliberately differentiated with respect to the conditions of confinement. Transfer to Norfolk is generally considered a reward for good behavior. The court takes judicial notice that conditions at Norfolk are less onerous than at Walpole.

■ "[A] major [adverse] change in the conditions of confinement" is considered the equivalent of loss of good time, invoking the guarantee of due process, *Wolff, supra,* (94 S.Ct. p. 2982 n. 19).

Various courts have recognized that the conditions of confinement may be adversely changed for administrative reasons, for general security, or because of the availability in a particular institution of programs of rehabilitation thought to be appropriate for a particular inmate. It is also arguable that some classification decisions, such as one based on a prediction of threats to the general security, are dependent upon the ability of trained personnel to translate a myriad of perceived signals into a specific warning. No prison administration can afford to ignore such warnings even though the bases for them are not susceptible to objective articulation. The due process required in such cases, however, need not be delineated here, since the evidence adduced in this case is of a different character.

It is not always easy to distinguish discipline from treatment, since the goal of each is to induce the inmate to refrain from further infractions of the rules. The distinguishing feature of punishment, however, is that it is a consequence of specific past conduct. Gomes v. Travisono, *supra,* 490 F.2d at 1215; United States ex rel. Haymes v. Montanye, 505 F.2d 977 (2nd Cir., 1974). Packer, *supra,* p. 33.

■■ I therefore hold that any classification which imposes a substantial adverse change in the conditions of confinement because of specific prior conduct is disciplinary and subject to the minimum standards of due process imposed by *Wolff,* notwithstanding the presence of elements of treatment, security or administrative necessity. The actions taken in this case were disciplinary.

If it is ever claimed that transfer of an inmate to Cell Block 10 is justifiable for purposes of treatment, the defendants will have the heavy burden of establishing such a proposition by some form of objective evidence.

■ I should make it clear that due process is directed at the procedure and not at the result. In view of the difficulties of prison administration, the broadest discretion must be given to correction officials to carry out their nearly impossible tasks. Procunier v. Martinez, *supra,* 94 S.Ct. pp. 1806–1807. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff, supra,* 94 S.Ct. p. 2976; United States ex rel. Haymes v. Montanye, *supra,* 505 F. 2d p. 980. It is not the business of the court to substitute its judgment for that of prison officials, so long as these officials act within the broad parameters of procedural due process.

■ The following constitutes the fundamental minimum:

1. Advance written notice of charges must be given to the inmate, no less than 24 hours in advance of hearing before an impartial tribunal.

2. There must be a written statement of the evidence relied upon and the reasons for the disciplinary action.

3. The inmate should be allowed to present documentary evidence in his defense, and to call witnesses if permitting him to do so will not jeopardize institutional safety or correctional goals.

4. Where the inmate is illiterate, or where complexity of issues makes it unlikely that the inmate will be able to collect and present evidence necessary for an adequate comprehension of the case, he may seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid from staff or a competent inmate designated by the staff.

■ The notice must at the very least describe the alleged conduct of the inmate which has precipitated the proposed reclassification, giving time and place. It must describe the procedure to be followed at the hearing and the inmates procedural rights as above described.

■ Practical necessity requires that the hearing tribunal will ordinarily be made up of prison staff with prior knowledge of the inmate and some general interest in the outcome. The requirement of impartiality requires, at the very least, however, that the tribunal not include the accusing officer. Bundy v. Cannon, 328 F.Supp. 165, 172 (D.Md., 1971)

■ While confrontation and cross-examination of accusers are not required under Wolff, and are left to the discretion of the prison officials, safeguards should be imposed to prevent abuse of that discretion. At the very least, the record must show that the hearing body has made a specific finding (1) that confrontation and cross-examination would potentially disrupt the institution and (2) of the underlying facts upon which that conclusion is based. Clutch-

ette v. Procunier, opinion on rehearing, 510 F.2d 613 (9th Cir., 1974).

■ *Wolff*, furthermore, has not diminished the responsibility of prison officials themselves to subject accusing witnesses to probing examination. Palmigiano v. Baxter, 487 F.2d 1280, 1290 (1st Cir. 1973), vacated and remanded, 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974). It follows from the previous discussion that if the testimony against the inmate is not to be presented directly by witnesses, it nevertheless must be revealed to the inmate with sufficient detail to permit the inmate to rebut it intelligently.

## B. CRUEL AND UNUSUAL PUNISHMENT

■ The conditions existing in Cell Block 10 do not of themselves offend the Eighth Amendment prohibition against cruel and unusual punishment. Detention in Cell Block 10 for a period out of proportion to the offense being punished, however, or for such a long period as to run the risk of permanent damage to the physical and mental health of an inmate might well be offensive. O'Brien v. Moriarty, 489 F.2d 941, 944 (1st Cir. 1974); Johnson v. Anderson, 370 F.Supp. 1373, 1387 (D.Del.1974). There is no institutional safeguard in the present system at Walpole against unreasonably long detention. The provision for a review every 90 days is inadequate, since no objective criteria are provided by which the reviewing body is to be guided.

## REHEARING

On the motion of the defendants the court permitted a rehearing of the above matter to receive additional testimony. As a result of this hearing, held on December 27, 1974, I make the following additional findings and rulings.

[12] The Department of Correction has established a comprehensive disciplinary system described in Commissioner's Bulletin 72–1, "Disciplinary Policy,"

which has been in effect since June 5, 1972. It provides for summary disposition of "minor offenses," with a right of an appeal to a disciplinary board, and a full hearing before a disciplinary board on "major offenses." This bulletin calls for the promulgation of more detailed regulations for each institution by the Superintendent thereof, and on January 29, 1974, the Superintendent of MCI, Walpole, issued Institution Order 4310.1, "Disciplinary Procedures and Unit Operation." These two governing documents, taken together, fully comply with and, in some respects, exceed the requirements of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 706 (1974).

Commissioner's Bulletin 72–1 provides, however, in paragraph VII D, that no formal disciplinary procedures will be held where the offense is also a felony which has been referred to the District Attorney for investigation and prosecution in court. See also Institution Order 4310.1, Section 9.

One of the sanctions available to the disciplinary board at MCI, Walpole, as punishment for a major offense is confinement to the Isolation Unit, located in Cell Block 9. M.G.L.A., Chapter 127, Section 41. Conditions of confinement on Cell Block 9 are substantially the same as on Cell Block 10, as previously described, except that inmates are not allowed to have any personal property other than minimal clothing, and are not ordinarily admitted to any educational or counselling program. *The maximum period of confinement to isolation for each offense, however, is fifteen days.*

Inmates on Cell Block 10 may have personal property (Daigle in fact has a television set) and have access to some educational and counselling programs, but their confinement in Cell Block 10 is for an *indefinite period,* subject to review every ninety days. Inmates are transferred to Cell Block 10 for reasons other than specific infractions of the rules and indeed some transfers are voluntary on the part of inmates who fear that their lives would be endangered in the general population of the institution. Transfers to Cell Block 10 are not ordinarily perceived by the prison administration as disciplinary.

When Cell Block 9 is full, however, inmates who are serving periods of "isolation" as punishments for specific violations are transferred to Cell Block 10.

Another sanction which is open to the disciplinary board is a "Recommendation to superintendent, (for ultimate decision by the Commissioner) of transfer to department segregation unit." Institution Order 4310.1, Section 11.5(b)(3)iii. If such a recommendation is made a hearing is then held by a Departmental Classification Committee. Departmental Order 4400.1. The Departmental Classification Committee then, as in cases of classification for purposes of security, treatment or administrative necessity, reviews the inmate's entire history, but does not conduct evidentiary hearings as to the offenses of which the inmate stands accused in his institutional record.

Where guilt has been established by a disciplinary board, after a hearing conducted in accordance with current rules, the Departmental Classification Committee is justified in proceeding without a further hearing. Due process does not require more than one hearing.

The plaintiffs, however, did not get that one hearing. There alleged offenses had been referred to the District Attorney, and under paragraph VII D of Commissioner's Bulletin 72–1 and section 9.2 of Institution Order 4310.1, no disciplinary hearing could be held.

 The rule against invoking disciplinary procedures when the alleged offense has been referred to the District Attorney is, according to defendants' counsel, based on an apprehension that the combination of judicial proceeding and institutional punishment would constitute double jeopardy, and might also interfere with the inmate's privilege against self-incrimination. This apprehension appears to me to be groundless. The constitutional prohibition against

double jeopardy applies only to judicial proceedings. United States v. Cordova, 414 F.2d 277 (5th Cir. 1969); United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967); Johnson v. Anderson, 370 F. Supp. 1373, 1382 (D.Del.1974). In any case, the constitutional problem is certainly not solved by inflicting the punishment and depriving the inmate of due process as well. The privilege against self-incrimination is preserved by Institution Order 4310.1, Section 11.4 b) and paragraph IV A of Commissioner's Bulletin 72–1. The privilege is personal to the inmate, and he may claim it, or waive it at his option.

The plaintiffs were entitled to a full hearing on the issue of guilt before one or another of these responsible bodies, either a disciplinary board or a classification committee, before they were committed to substantially more adverse conditions of confinement because of their alleged offenses.

It appears to me, that in the future, the required result could most easily be accomplished by rescinding the rules forbidding disciplinary board hearings in cases which have been referred to outside law enforcement authorities. It does not seem to me that these rules serve any useful purpose. It is up to the defendants, however, and not the court, to determine the specific means by which they will comply with the orders hereinafter entered.

■ Although the present disciplinary hearing rules in force at MCI, Walpole, exceed the requiremements of *Wolff*, they are the rules to be applied to whatever disciplinary hearings are held. It is axiomatic that one of the basic elements of due process is uniform treatment.

## C. CONCLUSION

■ No specific finding under the Eighth Amendment is required as to these plaintiffs in view of my conclusions with respect to due process. It is clear that the transfer of the plaintiffs to Cell Block 10 was on account of specific past conduct, and in effect was a disciplinary transfer, however else it may be officially styled. It is equally clear that the minimum requirements of due process required by *Wolff* were not afforded them.

There does not appear to be any material issue of fact, nor any reason to hold further hearings before making a permanent order, at least as far as injunctive relief is concerned. Under the provisions of Fed.R.Civ.P. 65, the hearings on preliminary and permanent relief are hereby consolidated. The plaintiffs' claim for damages has not been heard and must wait upon further proceedings. Accordingly, I hereby enter the following Order.

## ORDER

It is ordered, adjudged and decreed that:

(1) The defendants are hereby enjoined from retaining the plaintiffs in detention in the Departmental Segregation Unit at MCI, Walpole, or from transferring them to such detention because of their specific prior conduct until they have been afforded a disciplinary hearing in accordance with Commissioner's Bulletin 72–1 and Institution Order 4310.1.

(2) The defendants are enjoined from retaining the plaintiffs in or transferring them to the Departmental Segregation Unit for treatment unless a classification committee, after a hearing, has made specific findings based on evidence adduced at such hearing that there is a treatment program available in said Unit which is more appropriate for each plaintiff's then condition than any treatment program available to the general population at MCI, Walpole.

(3) The defendant Hall shall within 60 days submit to the court for

approval departmental regulations which will:

(a) clearly identify disciplinary proceedings in accordance with the foregoing Opinion;

(b) provide for hearings in accordance with Commissioner's Bulletin 72-1 and substantially in accordance with Institution Order 4310.1 before an inmate is reclassified to substantially more adverse conditions of confinement because of alleged specific prior conduct, notwithstanding a referral to outside law enforcement authorities for investigation of such alleged prior conduct and possible prosecution of the inmate;

(c) provide for a procedure for the transfer of inmates to the Departmental Segregation Unit for purposes of treatment in accordance with paragraph (2) above; and

(d) provide for an institutional procedure which will prevent any disciplinary detention in the Departmental Segregation Unit, as defined in the foregoing Opinion, for unreasonably long periods, or under circumstances creating a risk of permanent mental or physical harm to an inmate, in violation of the Eighth Amendment to the Constitution of the United States.

(4) The case is to stand for further hearings on the plaintiffs' claim for damages.

### APPENDIX A

A Recommendation by Mr. Workman, D.C.C. Member, on the Case of Gerald Sousa W-938

September 27, 1974

Mr. Sousa was placed in D.S.U. status on 3-6-1974 due to the precipitating incident that occurred on 10-24-1973 (he refused to obey an officer and attempted to conceal bloodstained jacket and dungarees implicating him in the death by stabbing of an inmate earlier that day) and a history following imprisonment on 7-2-64 with a life sentence for first degree murder that has included the following: D.S.U. placement from 4-8-70 to 10-7-70 for behavior that had caused serious injury to two officers and involved assaults, drugs, and unwholesome relationships with other inmates; inciting a disturbance in a segregation unit on 6-14-71; and two incidents of Assaulting an Officer and Inciting a Disturbance on 11-20-1972 and 12-20-1972. He has been in Block 10 since 11-2-1973. It has seemed that when he is in population, he presents a threat to the safety of both other inmates and officers and potentially to the institution.

The D.C.C. noted certain areas of progress and positive involvement in its report of 3-6-1974 and recommended continued D.S.U. It recommended educational release to college courses in the MCI-W school and indicated willingness to consider transfer to MCI-N if he continued progress in his established activities. The recommendation regarding college courses was not pursued for reasons never made clear to the D.C.C. An event precipitating increased concern for security in Block 10 and a change of prison administration in June and July 1974 resulted in restrictions that sharply curtailed his work as a runner and he terminated it altogether. Counseling with the case manager became intermittent for a short period when he wanted to be seen on the other side of a screen as other persons had recently initiated this practice with inmates in D.S.U.; visiting often interfered with counseling sessions in available rooms. Educational and personal relationships with volunteers continued.

He received a Disciplinary Report on 8-4-1974 for A&B on a Correction Officer and Direct Threats to an Officer. He is said to have struck with a broom handle two officers who were restraining a friend of his. Officers have re-

ported being verbally abused. In late August Mr. Sousa and two other inmates began a "hunger strike" of sorts in apparent protest against conditions in Block 10. He is the spokesman for the group. A list of concerns was presented much later and only when they were requested by the administration. Mr. Sousa has told selected individuals that he did not want all of the publicity that developed and that he did not support the N.P.R.A. sponsored one day hunger strike. Lawyers for Mr. Sousa have suggested he would probably not continue his hunger strike if he is released from Block 10 and that he would be embittered if retained in D.S.U.

Considering the indication that Mr. Sousa would discontinue the hunger strike on release from D.S.U., the strike appears more a tactic than a matter of principle. It would appear that he intends it to put pressure on the D.C.C. for his release. As spokesman he has assumed a leadership position whether by design or not. His assumption of leadership in the past has frequently resulted in, or been associated with, conflict and institutional disturbance. In this instance he seems privately to be trying to disassociate himself from matters attendant to the strike that may be viewed in a negative sense, even while he has made little or no effort to do the same publicly. He seems now to be right in the middle of the "jail house politics" as he has said he would not get involved in if transferred to MCI–N. He must have realized that this position was detrimental to his professed goal of transfer to MCI–N. This appears to be a repetition of past behavior in which he locks himself into a position of maintaining an image he ends up fighting to preserve to everyone's seeming satisfaction but his own.

From a treatment and behavioral perspective it is hoped that he will be able to make better use of counseling and learn from this situation, not only how such negative and personally unfulfilling positions are developed, but also how he has to find within himself the means to disengage himself from them. Without such a learning experience, it seems likely that he would only repeat past experience when released into the general population.

On the basis of his behavior in these past two months, that is, the impulsive and aggressive behavior for which he received the 8–4–1974 Disciplinary Report, and the negative, manipulative, and image-keeping behavior associated with the hunger strike, it appears that he has not yet reached a point of personal maturity that would allow him to make a successful adjustment to life in the general population of MCI–Walpole. It is recommended, therefore, that he remain in D.S.U. status for another 90 day period with the support of a continuing counseling program.