**Arthur FANO et al.,
Plaintiffs-Appellees,**

v.

**Larry MEACHUM et al.,
Defendants-Appellants.**

No. 75–1033.

United States Court of Appeals,
First Circuit.

June 27, 1975.

Certiorari Granted Dec. 8, 1975.
See 96 S.Ct. 444.

---

Michael C. Donahue, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., and John J. Irwin, Asst. Atty. Gen., Chief, Crim. Div., were on brief, for appellants.

Richard E. Shapiro, Boston, Mass., with whom Robert A. Stolzberg, Roxbury, was on brief, for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

■■ We turn once again to the task of evaluating inmates' due process claims in the wake of *Wolff* v. *McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The district court provides us with a succinct summary of the facts, which the parties accept as accurate. 387 F.Supp. 664, 666–67 (D.Mass.1975). In the fall of 1974 there was a period of unrest at the Massachusetts Correctional Institution at Norfolk. There were nine fires, thought to have been set, which were serious enough to require the presence of outside fire departments, and several other fires which were less serious. Plaintiffs were taken from the general population at Norfolk and placed in the Receiving Building at the Institution, which serves as an informal segregation unit. On October 25, 1974, each plaintiff was given a copy of a disciplinary report. The offenses charged against each plaintiff were described in substantially the same terms as appeared in the notices of reclassification hearings subsequently received. Since the alleged offenses were referred to the local district attorney for investigation and possible prosecution, the applicable regulation directed that no disciplinary hearings be held.[1]

■ On November 4 each plaintiff received a Notice of Classification Hearing. These notices reported that information received through reliable sources indicated that the plaintiffs were variously linked to the planning and execution of the fires, possession of contraband such as weapons, or trafficking in drugs. Classification hearings[2] were held, at which each plaintiff was represented by counsel. The evidence with respect to the alleged offenses, however, was given in closed session outside of the presence of plaintiffs and their counsel and was apparently, in each case, in the form of a recitation by Superintendent Meachum of information purportedly furnished to him by a confidential informant. The nature of this information was not revealed to plaintiffs or their counsel, even in summary form, nor were they informed of the dates and places of the alleged offenses.

---

1. The regulation is based on the theory that to grant a hearing might create difficulties of either double jeopardy or denial of the privilege against self-incrimination. We do not share the view that prosecution may not constitutionally be based on conduct which is also the subject of disciplinary proceedings. *See, e. g., Palmigiano* v. *Baxter,* 510 F.2d 534 (1st Cir. 1974). Nor do we feel that this concern on the part of the Commonwealth, if well-founded, could immunize what would otherwise be a due process violation. *See Daigle* v. *Hall,* 387 F.Supp. 652, 660–62 (D.Mass.1975); note 2 *infra.*

2. We attach no significance for present purposes to the fact that these proceedings were for "classification" rather than "discipline". Defendants assert that "there are in the instant case as many administrative overtones as disciplinary ones", but we have already indicated that in our view the motive of prison officials, as such, is not properly a part of the due process calculus. *Gomes* v. *Travisono,* 510 F.2d 537, 541 (1st Cir. 1974). Whether the transfer is thought of as punishment or as a way of preserving institutional order, the effects on the inmate are the same and the appropriateness of the action depends upon the accuracy of the official allegation of misconduct.

The classification board recommended transfer to either Walpole or Bridgewater for all of the plaintiffs except Royce. These recommendations were appealed to Commissioner Hall. The appeals were denied, though the recommendations were modified in some instances with regard to the receiving institution and Royce was ordered transferred to Walpole.

■ Plaintiffs sought declaratory and injunctive relief and damages. 42 U.S.C. § 1983. The district court found that the proposed transfers violated the inmates' due process rights under the Fourteenth Amendment, and defendants were enjoined from carrying out the transfers until fuller hearings were held.[3] We have occasion here to review only the propriety of this preliminary injunction, the district court having reserved decision on the damage claims pending further hearings.[4]

The first issue presented is whether the decision to transfer inmates from Norfolk to maximum security institutions within Massachusetts is of such a character that the due process rights of potential transferees are brought into play. *Palmigiano* v. *Baxter,* 487 F.2d 1280, 1284 (1st Cir. 1973), *vacated,* 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974), *after remand,* 510 F.2d 534 (1974), *cert. granted,* 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975); *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). We first grappled with the due process issues presented by prison transfers in *Gomes* v. *Travi-sono,* 490 F.2d 1209 (1st Cir. 1973). That case involved Rhode Island inmates who were being transferred to prisons throughout the country, and, in concluding that such transfers had an impact on inmates' liberty sufficient to require due process protections, we took pains to emphasize that we did not view that disposition as foreclosing a contrary result with regard to intrastate transfers. *Id.* at 1214 n.8; *id.* at 1217 (Campbell, J., concurring). The Supreme Court subsequently offered its initial guidance in this area. *Wolff* v. *McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Wolff* established that the forfeiture or withholding of "good time" credits affects a prisoner interest which "has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Id.* 418 U.S. at 557, 94 S.Ct. at 2975. *Gomes* was vacated for reconsideration in light of *Wolff,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, and after remand we proceeded to reconsider "What procedures are required?", after noting that *Wolff* reaffirmed "that prisoners suffering the prospect of serious deprivations are entitled to some process". 510 F.2d 537, 539 (1974).

The question thus becomes one of whether the detriment worked by an intrastate transfer from a medium-security institution to a maximum-security prison is serious enough to trigger the applica-

---

**3.** This action was originally commenced by seventeen inmates alleging that their reclassification into substantially more adverse conditions of confinement within Norfolk denied them due process. The six inmates now before the court as appellees subsequently filed an amended complaint raising the additional issue relating to the impending transfers from Norfolk to other institutions. The district court's hearing on the request for a preliminary injunction was limited to the claims of those six plaintiffs. Although the order entered by the district court directed defendants to return the plaintiffs to the general population at Norfolk, the parties to this appeal have addressed themselves only to the issues raised by transfers from Norfolk to other prisons. We therefore will not consider here the application of due process principles to reclassification within a single institution. We note that the reclassification issue has been directly confronted in *Daigle* v. *Hall,* 387 F.Supp. 652 (D.Mass.1975).

**4.** Defendants' appeal from the district court's failure to dismiss the damage action must be dismissed for want of a final decision. 28 U.S.C. § 1291; *King* v. *Higgins,* 495 F.2d 815, 815 n.1 (1st Cir. 1974).

tion of due process protections. Defendants correctly point out that *Gomes* may be distinguished from the instant case to the extent that our resolution of the interstate transfer question relied upon the assumption that interstate transfers will often be conducted between institutions which are separated by a significant distance. We noted in *Gomes* that the distance factor alone may make communication and visitation more difficult, and it is true that here the geographical issue is an irrelevant one.[5] Moreover, there has been no suggestion that the plaintiffs are subject to the administrative segregation to which interstate transferees were routinely subjected upon arrival at the receiving institutions.

In other ways, however, the disadvantages attendant upon these transfers are both more serious and more certain than those flowing from interstate transfers. While *Gomes* recognized that transferees were subjected to temporary administrative segregation at the receiving prisons, it was not assumed that thereafter their conditions of confinement would be more adverse than they had been before transfer. Defendants have stipulated, however, that Walpole and Bridgewater have stricter security and fewer rehabilitative programs than Norfolk, and that furloughs are more difficult to obtain at Walpole. The district court's findings of fact included the following:

"I find that the conditions of confinement at MCI, Walpole and MCI, Bridgewater, are substantially more adverse than they are at MCI, Norfolk. I further take judicial notice that these institutions have been deliberately differentiated to provide graduated conditions of confinement within the Department of Correction." 387 F.Supp. at 667.

*See also Daigle* v. *Hall*, 387 F.Supp. 652, 659 (D.Mass.1975). Defendants do not

challenge the accuracy of this finding, nor could they easily do so in light of the facts to which they had stipulated, though they do argue that the hardships incurred through transfer do not assume constitutional proportions.

It should not escape notice that, aside from the distinctions discussed above, the consequences of intrastate and interstate transfers are for the most part indistinguishable. In either case "disadvantages stem from the breaking off of established programs, both educational and rehabilitative, and orientation to a new setting, programs, rules and companions." *Gomes I,* 490 F.2d at 1213. What was viewed in *Gomes* as a possibility—that a transferee may be considered an identified troublemaker and treated unfavorably as a result—has been stipulated to in this case. The parties agreed that the "determination to transfer Plaintiffs, and the basis therefore, will be noted on their institutional record and will be considered by the Parole Board, the Furlough Board and other administrative agencies of the Department of Correction. This may affect Plaintiffs' attempts to gain parole, furlough, work release, and other privileges." *See generally Catalano* v. *United States,* 383 F.Supp. 346 (D.Conn.1974).

■ In light of the disadvantages accompanying the transfers here at issue, the legal principles articulated in *Wolff, Gomes* and the transfer cases decided by other lower federal courts compel the conclusion that the due process clause is applicable. At issue is not a simple loss of privileges, for which a hearing may not be required, *Wolff,* 418 U.S. at 571–72 n. 19, 94 S.Ct. 2963, but a significant modification of the overall conditions of confinement. We hold that the inmate interests affected fall within the "liberty" protected by the Fourteenth Amend-

---

5. Defendants inform us that Norfolk and Walpole are approximately one mile apart. Plaintiffs do not claim that transfer from Norfolk to either Walpole or Bridgewater creates difficulties because of the distance involved. This does not mean, of course, that transfers within

a single state will never cover a distance sufficient to make them burdensome. *See United States ex rel. Haymes* v. *Montanye,* 505 F.2d 977 (2d Cir. 1974), *petition for cert. filed,* 43 U.S.L.W. 3282 (Nov. 1, 1974) (No. 74–520).

ment.[6]  *Wolff,* 418 U.S. at 557, 94 S.Ct. 2963;  *Newkirk* v. *Butler,* 499 F.2d 1214 (2d Cir.), *cert. granted,* 419 U.S. 894, 95 S.Ct. 172, 42 L.Ed.2d 138 (1974);  *Clonce* v. *Richardson,* 379 F.Supp. 338 (W.D.Mo. 1974);  *Robbins* v. *Kleindienst,* 383 F.Supp. 239 (D.D.C.1974);  *see Palmigiano* v. *Baxter,* 487 F.2d 1280, 1284–85 (1st Cir. 1973), *vacated,* 418 U.S. 908, 94 S.Ct. 3200, 48 L.Ed.2d 1155 (1974), *after remand,* 510 F.2d 534 (1974), *cert. granted,* 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975);  *Clutchette* v. *Procunier,* 497 F.2d 809, 814–15 (9th Cir. 1974), *on rehearing,* 510 F.2d 613 (1975), *cert. granted,* 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975).

■  *Wolff* requires that, having found due process guarantees to be applicable, we proceed to determine what procedures are appropriate under the circumstances.  This is done by balancing the substantiality of the loss an inmate would suffer because of transfer against the burden which the procedures would place on prison officials.  *Gomes II,* 510 F.2d at 541.  While this inquiry will in many cases be multifaceted, here the controversy is an extremely narrow one.  In the first place, plaintiffs' only objection to the hearings which they were given is that they were excluded during the recitation of information said to have been provided by confidential informants.  Plaintiffs were not given any summary of the evidence beyond that contained in the notices which preceded the hearings.

*Wolff* found that under the circumstances there presented due process required that there be a written statement as to the evidence relied on and the reasons for the disciplinary action.  It was recognized, however, "that there will be occasions when personal or institutional safety are so implicated, that the statement may properly exclude certain items of evidence."  418 U.S. at 565, 94 S.Ct.

at 2979.  This cryptic reference offers us little assistance in our effort to determine whether the prison officials were within their authority here in declining to reveal the substance of the informant statements.  The defendants' freedom of action can be no greater in this context than that which *Wolff* accords with regard to confrontation and cross-examination, matters left "to the sound discretion of the officials of state prisons" because they were viewed as presenting greater hazards to institutional interests than the requirement of a written statement.

That the issue is narrowed even further is evident from the basis of the district court's decision.  In ruling that the defendants must provide a summary of the information derived from informants, the district court relied primarily on section 11.4(h) of Institution Order 4310.1 (Jan. 29, 1974), which prescribes the procedures to be followed in disciplinary hearings at Walpole:

"The board may issue any orders it deems necessary to conducting a thorough and adequate investigation, including the calling of witnesses and production of evidence.  No testimony may be taken outside the accused resident's presence unless he voluntarily absents himself, or the board chairman determines that disclosure would involve:

(1) Subjecting the informant to a significant risk of harm, or

(2) A substantial risk to institutional security

(3) On making a finding that a threat exists and that there is need for protection of sources, the board chairman will note such a finding in the hearing record

(4) He will also summarize the information in question for the accused resident and state generally the

---

**6.** It makes no difference that the Commonwealth need not have created a corrections system containing institutions with divergent conditions of confinement.  The advantages of confinement in a more desirable institution are in this regard similar to the state-created right to good time credits which was involved in *Wolff,* 418 U.S. at 556–58, 94 S.Ct. 2963.

board's reasons for such protective action."

■ Defendants misapprehend the basis for the district court's decision when they assert that they "were under absolutely no obligation to follow at Norfolk" this Walpole regulation. Even aside from the equal protection problems which might arise were inmates in different institutions given substantially different procedural protections, the district court properly viewed the Walpole regulation as a persuasive indication that the release of a summary of informant-provided information is not inconsistent with institutional requirements. Indeed, no suggestion has been made that the Walpole rule is unworkable or unduly burdensome. Having chosen to extend the protections of section 11.4(h) to inmates at the maximum-security institution at Walpole, defendants may not, even in the exercise of the discretion recognized in *Wolff,* deny similar procedures to inmates at Norfolk, a medium-security prison. The balancing of interests required for the application of due process principles in the prison environment is not one for which courts are particularly well-equipped, and here the district court quite properly resolved the controversy before it by reference to the balancing reflected in the Walpole regulations.

■ One subsidiary point remains. Under the procedures mandated by the district court, the notice of hearing given inmates must "at the very least state the time and place of the alleged offense with reasonable accuracy". Not only is it difficult to discern how a notice lacking this element could adequately inform an inmate of the charges against him and enable him to prepare an adequate defense, *Wolff,* 418 U.S. at 564, 94 S.Ct. 2963, but this information would not in any case go beyond that which we have held must be provided in summary form after presentation at the hearing. Since we can see no significant institutional interest which would be served by withholding at the time of notice information which must ultimately be revealed, we agree with the district court as to the required form of notice.

*Affirmed.*

LEVIN H. CAMPBELL, Circuit Judge (dissenting).

As the issue of intra-jurisdictional prison transfers is under submission before the Supreme Court in *Newkirk* v. *Butler,* 499 F.2d 1214 (2d Cir. 1974), *cert. granted sub nom. Preiser* v. *Newkirk,* 419 U.S. 894, 95 S.Ct. 172, 42 L.Ed.2d 138 (1975), it seems likely that what we do or say here will have only passing significance. Still I shall venture the view that a prisoner's interest in remaining in one institution rather than another within the same state is not a species of "property" or "liberty" as those words are used in the due process clause of the Constitution.

In *Wolff* v. *McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Court held that good-time credits, having been created by the state and denied as a penalty for major misconduct, were embraced within fourteenth amendment "liberty". *See Preiser* v. *Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). *See also Haines* v. *Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (disciplinary confinement affects a protected interest). But transfers[1] seem to me to belong in a quite different category. Transfers unquestionably have a major impact on the personal life of a prisoner (although intrastate transfers do not uproot the inmate and separate him from a unitary system of correction and parole as in the case of interstate transfers). But in deciding whether or not to label the prisoner's interest therein a "liberty" or (less

1. This circuit held in *Gomes* v. *Travisono,* 490 F.2d 1209 (1973), *vacated and remanded,* 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974), *aff'd in part,* 510 F.2d 537 (1974), that transfers of state prisoners to out-of-state correctional institutions pursuant to interstate compact triggered due process standards. I expressly reserved judgment on transfers within a single jurisdiction.

plausibly) a "property" interest within the fourteenth amendment, it should be recognized that Massachusetts has not conferred a statutory right upon inmates to be at one institution rather than another. While Walpole is a more secure facility than Norfolk, a prisoner has no vested right to serve his term in one place rather than the other. One might draw an analogy, admittedly only suggestive, to the status of school teachers: good-time rights, like a tenured teacher's expectation of continued employment, are matters of entitlement absent cause for severance; but a prisoner's preference that he be lodged at Norfolk rather than Walpole is not a matter of entitlement and seems more analogous to a probationary teacher's unsecured hope to retain a job. *Cf. Board of Regents* v. *Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The tenured teacher's interest is, of course, a "property" rather than a "liberty" interest. Still, even in defining a prisoner's "liberty" interest, one must ask not only whether a particular event may cause loss to the prisoner but whether one in his position has any claim to what was taken away.[2] Prisoners are, by definition, prisoners. Changes in the conditions of confinement, whether involving a different cell assignment, a new meal schedule, or transfer to a new facility, seem to me to fall within the state's general right to confine, safeguard, and rehabilitate. To treat them as "liberties" belonging to the inmate invites greater interference with the management of prisons than seems either wise or constitutionally mandated.

Where within the state penal system a prisoner is to be lodged seems to me a judgment which the state has the exclusive right to make—summarily if need be. Such decisions are part and parcel

of its power to keep the prisoner safely, to protect other prisoners, and to operate its prisons. State penal systems normally consist of more than one institution. Indeed, large states may have dozens of such institutions. Administrators must decide where best to place inmates. They must consider available space and facilities and which programs are best suited to which inmates. As prisoners are involuntary inhabitants and some are dangerous and unpredictable, administrators must decide whether a given inmate is more likely to escape from one place than another, and whether the mere presence of an inmate in a given setting is likely to be volatile and more dangerous. Such judgments may often be little more than educated guesses based on suspicions. They may involve predictions of future dangerousness which in turn echo assumptions as to the inmate's role in past disturbances. While I can understand the argument that no adverse assumptions should ever be made without minimal due process—hearing, confrontation of witnesses, and the like—I do not think the realities of the state-prisoner relationship admit to classifying such decisions, when relating to a transfer, as a liberty interest of the prisoner. Penal authorities will perhaps think it best to afford safeguards, but I do not think the Constitution can reasonably be said to require them.

I concede that transfers of the present sort—based on charges of past misconduct rather than on more general grounds—bear many resemblances to disciplinary actions. Here the inmate's record will reflect the grounds for transfer and this may affect his parole rights. In *Gomes I,* dealing with interstate transfers, we thought that a distinction could be made between punitive and non-punitive transfers. But on reflec-

---

2. A civil servant sent to Alaska, a soldier sent to Vietnam, or a prisoner sent to another institution may, in a private sense, suffer "grievous loss", but the nature of the organization and of their role precludes acknowledging any "liberty" or "property" right to remain in one location. Notwithstanding language in *Morrissey*

v. *Brewer,* 408 U.S. 471, 481–84, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), cautioning against distinctions based on "privileges" as opposed to "rights", it is necessary to consider not only whether what happens causes subjective loss to the individual, but whether he has a right to any protection against that loss.

tion we recognized, correctly I believe, that giving effect to labels of that sort raised more problems than it solved. It would invite litigation and confusion over the "real" as opposed to the ostensible reason for transfer. Moreover, transfers based on past misconduct are not so much punitive as they are intended to ward off future disruption at the transferor institution. The decision is thus also truly "administrative". In *Gomes II* we eliminated any attempted distinction, and decided that all out-of-state transfers should be treated alike for due process purposes. I think this is the right approach, and I would not wish to decide the present case on the basis of fine-spun distinctions between labels. Rather I feel obliged to conclude that an inmate is no more entitled to due process protection in connection with transfers for purported misconduct than he would be for any other reason. The reason for transfer is simply irrelevant. The state's interest is paramount.[3]

Nonetheless, while the greater good of the institution and its other inmates may require that administrators retain broad transfer power, there is no need to permit an inmate's parole chances to be diminished by derogatory information he is never allowed to meet. This is a separate and different question. If parole is a "liberty" right entitling an inmate to fair procedures, I would forbid the use of the fact of transfer by the parole board unless the charges upon which the transfer was based were established in a manner comporting with due process.

I would reverse the decision of the district court, except I might enjoin the adverse use of the fact of transfer in any future parole proceedings.

---

**3.** Administrative realities may sometimes necessitate the flexibility to transfer even on the basis of demonstrably inadequate information. If, for example, the warden has narrowed the likely cause of disruption down to several inmates, he may deem it prudent to transfer all without having objective proof that all are involved. A 40% risk that an inmate will disrupt or set a fire may, in some circumstances, be too great to take. The safety of other inmates and prison personnel may have to be weighed against fairness to certain individuals.